*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0292p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

    No. 05-5307

RICKY A. CARUTHERS,

        *Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00025—Robert L. Echols, Chief District Judge.

Argued: January 25, 2006

Decided and Filed: August 11, 2006

Before: MOORE and McKEAGUE, Circuit Judges; POLSTER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Hugh M. Mundy, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Philip H. Wehby, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Hugh M. Mundy, Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Philip H. Wehby, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

    MOORE, J., delivered the opinion of the court, in which POLSTER, D. J., joined. McKEAGUE, J. (p. 15), delivered a separate concurring opinion.

_____

## OPINION

_____

    KAREN NELSON MOORE, Circuit Judge. Defendant-Appellant Ricky A. Caruthers ("Caruthers") appeals his conviction for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Caruthers argues that the district court erred by denying his motion to suppress evidence obtained pursuant to an investigative detention, because the stop was both unjustified in its inception and excessive in its means. He also contends for the first time on appeal that the district court erroneously enhanced his sentence under 18 U.S.C. § 924(e), the Armed

---

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

Career Criminal Act ("ACCA"). Because the detention was justified by reasonable suspicion and was conducted in a reasonable manner, we **AFFIRM** the district court's denial of Caruthers's motion to suppress. We also **AFFIRM** Caruthers's sentence, because the district court did not err in applying the ACCA.

## I. BACKGROUND

### A. Factual Background

At approximately 1:15 A.M. on June 17, 2003, a central dispatcher with the Nashville police and fire departments received an anonymous emergency call. On the basis of this call, the dispatcher created a written report containing the following information: "Male black. . . . Red shirt, shorts, fired gun in the air, arguing with female at location, gun is in the suspect's pocket, fired the weapon once. . . . LO[cation], J. C. Napier." Joint Appendix ("J.A.") at 143-44 (Suppression Hr'g Tr. at 106-07) (Heath Test.). Officers Carl Stocks ("Officer Stocks") and Jonathan Mays ("Officer Mays") were dispatched to the intersection of Lewis and Lafayette Streets, the location of J.C. Napier public housing development, at approximately 1:20 A.M. They arrived on the scene about three to five minutes later.

The officers observed a black man wearing a red shirt (later identified as Caruthers) entering the parking lot of a nearby gas station; he was walking in the direction away from the J.C. Napier development. Nobody else was in the area. Officer Mays drove away in order to take a position at the opposite end of the alley behind the building. Officer Stocks pulled his cruiser alongside Caruthers, approximately two to three feet away. The cruiser's flashing lights were not on, and Officer Stocks did not have a weapon drawn. Officer Stocks remained in his vehicle's seat and said through the rolled-down window, "hey, man, come here a second," or "hey, man, come here, let me talk to you a second." J.A. at 48-49 (Suppression Hr'g Tr. at 11-12) (Stocks Test.). Caruthers then "took off in a hurried[] fashion around the corner of the business." J.A. at 49; *see also* J.A. at 50 ("He took off real quick, kind of in a semi-running [fashion] . . . ."). Officer Stocks exited his cruiser to give chase, momentarily losing sight of Caruthers. Officer Stocks followed Caruthers around the corner, where he saw Caruthers "kind of hunched down a little bit." J.A. at 50. Caruthers was "kind of against the wall of the business and he was kind of leaned over where kind of his knees were kind of bent a little bit, so he was kind of leaning toward the ground." J.A. at 51. Officer Stocks "told him to come here," whereupon Caruthers "turned around, put his hands up[,] and came walking back toward [Officer Stocks]." J.A. at 50. Officer Stocks "grabbed ahold of [Caruthers], escorted him to [the] patrol car, [and] placed him in the back seat." J.A. at 50. Officer Stocks did not tell Caruthers that he was under arrest, pat him down, or handcuff him before placing him in the patrol car, the doors of which were locked such that Caruthers would be unable to exit the vehicle without kicking out the window.

While these events were unfolding, Officer Mays, who had taken his position at the opposite end of the alley, proceeded to drive up the alley toward Officer Stocks and Caruthers. Officer Mays arrived on the scene as Officer Stocks placed Caruthers in the patrol car. A "few seconds" after placing Caruthers in the cruiser, Officer Stocks "went back to where [he] saw [Caruthers] standing hunched over and found the loaded weapon laying on the ground in plain view." J.A. at 50-51 (Stocks Test.); *see also* J.A. at 90 (Mays Test.). The pistol was "[e]xactly where [Caruthers] was leaned down." J.A. at 51 (Stocks Test.). In the pistol's chamber was a round with a crimped tip. Officer Stocks removed Caruthers from the cruiser and patted him down, discovering a bullet in his pants pocket. Officer Stocks arrested Caruthers, placing him in handcuffs. Officer Mays immediately found five more rounds in the back seat of Officer Stocks's cruiser. All of the bullets had crimped tips identical to the one in the pistol's chamber.

The entire encounter — from when Officer Stocks first saw Caruthers to when Officer Mays recovered the ammunition from the back of the patrol car — lasted three or four minutes.

## B. Procedural Background

After Caruthers was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924, he moved to suppress the ammunition and statements.[1] The district court denied the motion, holding that there was reasonable suspicion for Officer Stocks to conduct an investigative detention of Caruthers. The district court also held that Caruthers had no reasonable expectation of privacy in the pistol because he had abandoned it and that the discovery of the pistol and the bullet supplied probable cause to arrest Caruthers.

Pursuant to an agreement with the government, Caruthers entered a conditional guilty plea, explicitly reserving his right to appeal the denial of his suppression motion. With respect to the sentence that ultimately would be imposed, Caruthers waived his right to appeal certain issues. The waiver provision provided in relevant part:

> The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the offense level as determined by the Court or the manner in which that sentence was determined on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatever, in exchange for the concessions made by the government in this plea agreement. Such waiver does not apply, however, to claims of involuntariness, prosecutorial misconduct, ineffective assistance of counsel, or if the Court departs upward.

J.A. at 183 (Plea Agreement ¶ 13). The agreement also included provisions raising the possibility that the ACCA would apply. The district court accepted Caruthers's plea.

At sentencing, the court found, on the basis of Caruthers's three burglary convictions and one drug conviction, that Caruthers was an armed career criminal and calculated a sentencing range of 180 months (the statutory minimum for armed career criminals under § 924(e)) to 210 months (the ceiling for an offense level of 30 and a criminal history category of VI under the U.S. Sentencing Guidelines) in prison. The district court imposed a sentence of 180 months in prison and five years of supervised release.

Caruthers now appeals the denial of his motion to suppress. He also argues for the first time on appeal that his burglary convictions are not "violent felonies" within the meaning of the ACCA. Therefore, Caruthers contends, his fifteen-year sentence exceeds the statutory maximum of ten years (as set forth in § 924(a)(2)) for an unenhanced § 922(g)(1) conviction.

---

[1]The motion to suppress argues that "all evidence and statements obtained following the stop and arrest of [Caruthers] must be suppressed." J.A. at 15 (Mot. to Suppress at 5). This statement could conceivably include the pistol, but at the suppression hearing Caruthers's counsel conceded, J.A. at 157 (Suppression Hr'g Tr. at 120), that Caruthers had "standing" to challenge only the ammunition and statements. Although the Supreme Court has rejected the use of standing doctrine in this context, *Minnesota v. Carter*, 525 U.S. 83, 87-88 (1998); *United States v. Waller*, 426 F.3d 838, 844 n.1 (6th Cir. 2005), Caruthers's counsel was right to concede the point. *See California v. Hodari D.*, 499 U.S. 621, 629 (1991) (holding that property abandoned by a defendant while running away from the police is "not the fruit of a seizure" and therefore is not excludable); *United States v. Martin*, 399 F.3d 750, 752-53 (6th Cir. 2005).

## II. ANALYSIS

### A. Fourth Amendment

#### 1. Standard of Review

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Henry*, 429 F.3d 603, 607 (6th Cir. 2005) (internal quotation marks omitted). In so doing, we consider the evidence in the light most favorable to the government. *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). "With regard to *Terry*-stop analysis in particular, '[a]lthough the standard of review on the ultimate reasonable suspicion inquiry is *de novo*, the district court is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions, in making this determination. Accordingly, "due weight" should be given to the inferences drawn from the facts by "resident judges."'" *United States v. Foster*, 376 F.3d 577, 583 (6th Cir.) (alteration in original) (quoting *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002) (in turn quoting *Ornelas v. United States*, 517 U.S. 690, 698 (1996))), *cert. denied*, 543 U.S. 1012 (2004).

#### 2. Merits

We recently reviewed the relevant analytical framework for assessing an investigative detention under *Terry v. Ohio*, 392 U.S. 1 (1968): "In evaluating the constitutionality of a *Terry* stop, we engage in a two-part analysis of the reasonableness of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). "We first ask 'whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion.'" *Id.* (quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)). If the stop was proper, "then we must determine 'whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.'" *Id.* (omission in original) (quoting *Garza*, 10 F.3d at 1245). Caruthers challenges the constitutionality of the instant *Terry* stop along both dimensions, contending that the initial stop was not supported by reasonable suspicion and that the degree of intrusion was unreasonable.

##### a. Reasonable Suspicion

The first part of the analysis is whether there was reasonable suspicion to justify the investigative detention. This determination, which is made in light of the totality of the circumstances, *United States v. Arvizu*, 534 U.S. 266, 273 (2002), requires "the detaining officers [to] have a particularized and objective basis for suspecting the particular person stopped of criminal activity," *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). An "inchoate and unparticularized suspicion or 'hunch'" will not do. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). At the time of the stop, Officer Stocks knew that Caruthers — an individual whose general appearance and location matched the description given in the anonymous shot-fired call — fled and made furtive movements when approached by the police late at night in a high-crime area. We conclude that the circumstances in their totality amounted to reasonable suspicion.

We begin our inquiry with the fact that Caruthers matched the description given in the anonymous 911 call. In *Florida v. J.L.*, 529 U.S. 266 (2000), the Supreme Court held that an anonymous call reporting "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun," without more, was insufficient to justify a *Terry* stop. *Id.* at 268. As in *J.L.*, the caller here was anonymous and gave a general description of an alleged gun-wielder's appearance and location: a black man in a red shirt and shorts fired a gun into the air at the J.C. Napier public housing development. In fact, the tip here was even vaguer than the one in *J.L.*, as it included a less precise location and lacked any indication of the individual's age. Thus, there is

no doubt that the stop of Caruthers would have been impermissible if it had been justified solely by the anonymous call. *See, e.g.*, *Feathers v. Aey*, 319 F.3d 843, 846, 850 (6th Cir. 2003); *Northrop v. Trippett*, 265 F.3d 372, 382-83 (6th Cir. 2001), *cert. denied*, 535 U.S. 955 (2002); *United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005); *United States v. Brown*, 401 F.3d 588, 596 (4th Cir. 2005); *United States v. Morales*, 252 F.3d 1070, 1076-77 (9th Cir. 2001); *United States v. Colon*, 250 F.3d 130, 132, 134, 138 (2d Cir. 2001). These cases do not mean, however, that we may simply dismiss the anonymous call altogether where, as here, other suspicious circumstances also existed. The Supreme Court has explicitly instructed courts to avoid the approach of giving certain factors "no weight," because the "evaluation and rejection of . . . factors in isolation from each other does not take into account the totality of the circumstances." *Arvizu*, 534 U.S. at 274 (internal quotation marks omitted).

Yet we must be mindful of the Supreme Court's teachings in this area. An anonymous tip is less reliable than "a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." *J.L.*, 529 U.S. at 270. Although the tip here was corroborated in the sense that it accurately described Caruthers's "readily observable location and appearance," reasonable suspicion "requires that a tip be reliable *in its assertion of illegality*, not just in its tendency to identify a determinate person." *Id.* at 272 (emphasis added). Because the tip otherwise "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility," it lacked even "moderate indicia of reliability." *Id.* at 271. A sister court of appeals has effectively articulated two reasons underlying the Supreme Court's skeptical view of anonymous tips like the one here:

> The first concern relates to the motives of the tipster. A tipster who refuses to identify himself may simply be making up the story, perhaps trying to use the police to harass another citizen. . . . A second concern relates not to a tip's anonymity but to its level of specificity. Overly generic tips, even if made in good faith, could give police excessive discretion to stop and search large numbers of citizens. . . . [A] tip [like the one in *J.L.*] could, obviously, give police an excuse to stop and search a large number of young men. The Court's insistence on additional detail from the tipster and corroborating observation by the police helps ensure that police do not use vague tips to violate the Fourth Amendment rights of innocent citizens.

*United States v. Johnson*, 364 F.3d 1185, 1190-91 (10th Cir. 2004). In light of these concerns, we give the anonymous call little weight in the reasonable-suspicion calculus.

We turn next to Caruthers's reaction upon encountering Officer Stocks. The Supreme Court has explained that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). The behavior at issue in *Wardlow* was "unprovoked flight upon noticing the police," as the defendant "looked in the direction of the officers and fled." *Id.* at 122, 124. Caruthers does not dispute that he recognized Officer Stocks as a police officer and fled when Officer Stocks approached him. Instead, he argues that his actions were less suspicious because he simply "hurried" away in a "semi-running" manner rather than engage in the "headlong flight" that occurred in *Wardlow*, 528 U.S. at 124. Given that simply walking away from the police does not give rise to reasonable suspicion, *see Florida v. Royer*, 460 U.S. 491, 498 (1983); *Wardlow*, 528 U.S. at 125 (reaffirming *Royer*); *United States v. Patterson*, 340 F.3d 368, 371-72 (6th Cir. 2003); *Moreno v. Baca*, 431 F.3d 633, 643 (9th Cir. 2005); *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000), *cert. denied*, 532 U.S. 1014 (2001), we agree that "the speed of the suspect's movements may be relevant in the totality of the circumstances," *United States v. Gordon*, 231 F.3d 750, 757 (11th Cir. 2000), *cert. denied*, 531 U.S. 1200 (2001).

However, flight is not the only type of "nervous, evasive behavior." Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions. *See,*

*e.g.*, *J.L.*, 529 U.S. at 268; *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *Henry v. United States*, 361 U.S. 98, 103-04 (1959); *Joshua v. DeWitt*, 341 F.3d 430, 443-44 (6th Cir. 2003); *United States v. Barrett*, 890 F.2d 855, 861 (6th Cir. 1989); *United States v. Brown*, 334 F.3d 1161, 1167-68 (D.C. Cir. 2003), *cert. denied*, 541 U.S. 954 (2004). Although the police may validly consider an individual's furtiveness in deciding whether to conduct a *Terry* stop, courts must take care that the factor not be invoked cavalierly. Judge Posner has skillfully illustrated the difficulty:

> [T]he officer testified that he was additionally suspicious because when he drove by Broomfield in his squad car before turning around and getting out and accosting him he noticed that Broomfield was "star[ing] straight ahead." Had Broomfield instead glanced around him, the officer would doubtless have testified that Broomfield seemed nervous or, the preferred term because of its vagueness, "furtive." Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.

*United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (second alteration in original).

The purportedly furtive conduct here is of a sufficiently objective, particularized sort to alleviate such concerns. Soon after Officer Stocks began to give chase, Caruthers was seen "hunched down" near a wall, "kind of leaning toward the ground." Bending or leaning tends to be more suspicious when accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon, such as arm movements or the sound of an item being moved, *see United States v. McGlown*, 150 F. App'x 462, 468 (6th Cir. 2005); *United States v. Wynn*, 148 F. App'x 471, 475 (6th Cir. 2005); *United States v. McClellan*, No. 93-4084, 1994 WL 589497, at *5 (6th Cir. Oct. 25, 1994); *United States v. Edmonds*, 240 F.3d 55, 61-62 (D.C. Cir. 2001); *United States v. Raymond*, 152 F.3d 309, 311, 312 (4th Cir. 1998), although even the combination may not be enough in some circumstances, *see United States v. McKoy*, 428 F.3d 38, 40-41 (1st Cir. 2005); *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000). Here, that other indication was Caruthers's flight from the police immediately preceding his unusual posture. Viewed together, these two reactions could reasonably suggest that Caruthers fled from Officer Stocks so that he could discard a weapon or other contraband.

Finally, we address the "contextual considerations." *Wardlow*, 528 U.S. at 124. Officer Stocks encountered Caruthers late at night (1:20 A.M.) in a high-crime area. Although these factors may not, without more, give rise to reasonable suspicion, *see, e.g.*, *id.*; *Bennett v. City of Eastpointe*, 410 F.3d 810, 830, 831 (6th Cir. 2005); *United States v. Townsend*, 305 F.3d 537, 543 (6th Cir. 2002); *United States v. Dennison*, 410 F.3d 1203, 1213 (10th Cir.), *cert. denied*, — U.S. —, 126 S. Ct. 468 (2005); *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002), *cert. denied*, 538 U.S. 934 (2003), they are relevant to the reasonable suspicion calculus, *see, e.g.*, *Wardlow*, 528 U.S. at 124; *Adams v. Williams*, 407 U.S. 143, 147-48 (1972); *Watkins v. City of Southfield*, 221 F.3d 883, 888-89 (6th Cir. 2000); *United States v. Harris*, 192 F.3d 580, 584-85 (6th Cir. 1999); *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir.), *cert. denied*, 516 U.S. 872 (1995). Thus, the contextual considerations in this case support the stop.

We note, however, the dangers of relying too easily or too heavily on these contextual factors. "[A]ny person who happened to wander into a high-crime area, late at night, in the immediate aftermath of a serious crime, could be detained." *United States v. Woodrum*, 202 F.3d 1, 7 (1st Cir.), *cert. denied*, 531 U.S. 1035 (2000); *see also United States v. Ford*, 333 F.3d 839, 845 (7th Cir. 2003); *United States v. Gray*, 213 F.3d 998, 1001 (8th Cir. 2000). Furthermore, labeling an area "high-crime" raises special concerns of racial, ethnic, and socioeconomic profiling. As a sister circuit has convincingly explained:

> The citing of an area as "high-crime" requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity. District courts must carefully examine the testimony of police officers in cases such as this, and make a fair and forthright evaluation of the evidence they offer, regardless of the consequences. We must be particularly careful to ensure that a "high crime" area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.

*United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir.) (en banc), *cert. denied*, 531 U.S. 889 (2000). *See generally* David A. Harris, *Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked*, 69 IND. L.J. 659 (1994). Fortunately, these concerns are alleviated here because Caruthers concedes that "[t]he area around the intersection of Lewis and Lafayette streets in Nashville is a 'high crime' area where officers expect nightly calls regarding robberies or shots fired." Appellant Br. at 6. Notably, the "high-crime" area is circumscribed to a specific intersection rather than an entire neighborhood. Furthermore, the crimes that frequently occur in the area are specific and related to the reason for which Caruthers was stopped. Thus, we are satisfied that we have not too easily permitted the consideration of this factor.

Based on the analysis above, the totality of the circumstances — an individual, whose general appearance and location matched the description given in the anonymous shot-fired call, fled and made furtive movements when approached by the police late at night in a high-crime area — provided reasonable suspicion to conduct a *Terry* stop. This and other courts have concluded likewise in similar circumstances. *See United States v. McAllister*, 31 F. App'x 859, 864-65 (6th Cir. 2002); *United States v. Williams*, 403 F.3d 1188, 1193-94 (10th Cir.), *cert. denied*, — U.S. —, 126 S. Ct. 178 (2005); *United States v. Sims*, 296 F.3d 284, 286-87 (4th Cir. 2002); *United States v. Dupree*, 202 F.3d 1046, 1049 (8th Cir. 2000). We need not and do not hold that any subset of these circumstances would constitute reasonable suspicion.

### b. Degree of Intrusion

We proceed to the second part of the investigative-detention analysis: whether the degree of intrusion was reasonable. "As part of the second prong, we must 'ascertain whether the detention is reasonable, that is, (1) was it sufficiently limited in time, and (2) were the investigative means used the least intrusive means reasonably available.'" *Davis*, 430 F.3d at 354 (quoting *Bennett*, 410 F.3d at 825-26). Caruthers grounds his challenge not in the duration of the detention (which appears to have been very brief) but in its means, specifically objecting to his placement in the back of the police cruiser while Officer Stocks searched the alley for a discarded weapon or other contraband. "[N]o circuit has concluded that detention in the back of a police car automatically turns a *Terry* stop into an arrest." *Bennett*, 410 F.3d at 837; *see also United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996), *cert. denied*, 520 U.S. 1178 (1997). Nevertheless, "it is one of the factors to consider in determining whether" an investigative detention was unreasonably intrusive. *Bennett*, 410 F.3d at 837. The ultimate question is "whether [the] detention exceeded the purpose and objective of the stop." *Bradshaw*, 102 F.3d at 212 (footnote omitted).

When Officer Stocks approached Caruthers while investigating a shot-fired call, Caruthers fled and then was observed in a position suggesting that he was discarding what — given the call — might have been a gun. Naturally, Officer Stocks wanted to search that area for an abandoned weapon. Given that Caruthers had already demonstrated that he was a flight risk, it was reasonable for Officer Stocks to take steps to avert another attempted escape while he conducted this search. *See Bennett*, 410 F.3d at 840; *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004), *cert. denied*, 543 U.S. 1171 (2005); *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005), *cert. denied*, —

U.S. —, 126 S. Ct. 1345 (2006); *United States v. Conyers*, 118 F.3d 755, 757 (D.C. Cir. 1997). Furthermore, the stop was weapons-related, so it was reasonable for Officer Stocks to secure Caruthers for safety reasons while he searched the ground for the weapon, as at the very least it prevented Caruthers from lunging back for the weapon.[2] *See, e.g.*, *Bennett*, 410 F.3d at 840; *United States v. Lopez-Arias*, 344 F.3d 623, 628 (6th Cir. 2003); *Cortez v. McCauley*, 438 F.3d 980, 999 (10th Cir. 2006); *Flowers v. Fiore*, 359 F.3d 24, 30 (1st Cir. 2004). Finally, Officer Stocks was alone (because Officer Mays had not yet driven up the alley), so he could not rely on another officer securely to detain Caruthers while he searched. *See Maltais*, 403 F.3d at 556. In light of these circumstances, briefly placing Caruthers in the patrol car while searching the ground for an abandoned weapon was an investigative means reasonably related in scope to the situation at hand.

The three cases on which Caruthers relies are distinguishable. In *United States v. Richardson*, 949 F.2d 851 (6th Cir. 1991), we held that an investigatory detention ripened into a full arrest when the officers placed the defendant in the back of a police vehicle and questioned him. *Id.* at 854, 857. We have since explained that the critical fact in *Richardson* was the questioning of the defendant in the vehicle: "what had begun as an inquiry in a public place had escalated into a custodial interrogation in what was in essence a police interrogation room." *Jacob*, 377 F.3d at 580. Caruthers was subjected to no such interrogation here.

In *United States v. Butler*, 223 F.3d 368 (6th Cir. 2000), we also held that the defendant had been arrested when the officer placed her in the back of a patrol car. The key is that Butler had "identified herself, answered the officer's questions, and consented to [a] patdown which did not reveal anything suspicious," so "the officers were required under the Fourth Amendment to allow [her] to go free." *Id.* at 375; *see also Bennett*, 410 F.3d at 840 (noting that detention in the patrol car was unwarranted where, inter alia, the police had already searched and handcuffed the suspects). In contrast, Officer Stocks's investigation was just beginning when Caruthers was placed into the cruiser. Thus, the justification for the *Terry* stop had not yet expired, and there was no duty to release Caruthers.

Finally, in *United States v. Thompson*, 906 F.2d 1292 (8th Cir.), *cert. denied*, 498 U.S. 989 (1990), the Eighth Circuit held that placement of the defendants in squad cars exceeded the scope of *Terry* and constituted a full arrest because there were many officers on the scene, the defendants had not made any threatening movements, the officers who made the original stop evinced no safety concerns, the entire encounter lasted 1.5 hours, and the defendants were photographed at the scene. *Id.* at 1297. It is readily apparent that the circumstances of the instant case fall far short of the degree of intrusion in *Thompson*.

---

[2]Caruthers complains that Officer Stocks must not have been motivated by safety concerns, because Caruthers could have had another weapon on his person yet Officer Stocks did not frisk Caruthers before placing him in the cruiser. We acknowledge that this may have constituted bad policing, as it could have resulted in an armed individual being left unsupervised in the vehicle, but an officer's motivations are not relevant to the objective reasonableness standard of the Fourth Amendment. In any event, even with this oversight, detaining Caruthers in the patrol car had the safety benefit mentioned in the text. Finally, the argument that the Fourth Amendment is violated when an officer's actions were not intrusive enough (i.e., he should have frisked Caruthers, too) is curious, to say the least.

## B. Sentencing

### 1. Waiver

Caruthers argues that his sentence exceeds the statutory maximum for his conviction, because the district court erroneously ruled that he qualified for the ACCA enhancement.[3] The government responds that Caruthers waived, via his plea agreement, the right to appeal his sentence.

#### a. Scope of the Agreement

We initially address whether Caruthers's appeal comes within the scope of the plea agreement. According to the government, Caruthers waived his appeal by specifically agreeing that the ACCA sentencing enhancement would apply to him. This claim fails for two reasons. First, it is belied by the text of the provisions contemplating application of the ACCA, which are written in qualified rather than unconditional terms. J.A. at 172-73 (Petition to Enter a Plea of Guilty ¶ 5) ("I understand that I *may qualify* as an Armed Career Criminal enhancement and *if I do*, I will be subject to a mandatory minimum sentence . . . . I have been advised by my attorney that the guideline range *could be* 180-210 months imprisonment *if I qualify* for the 'Armed Career Criminal' enhancement." (emphases added)), 178 (Plea Agreement ¶ 2) ("The defendant understands, that *should he qualify* as an Armed Career Criminal, he faces a mandatory minimum sentence . . . ." (emphasis added)), 179 (Plea Agreement ¶ 3) ("The government and the defendant *anticipate* that the following guideline provisions will apply . . . ." (emphasis added)). Second, we have held that an agreement to be sentenced under the Guidelines does not effect a waiver of appeal. *United States v. Smith*, 429 F.3d 620, 626-27 & n.5 (6th Cir. 2005); *United States v. Puckett*, 422 F.3d 340, 343 (6th Cir. 2005); *United States v. Amiker*, 414 F.3d 606, 607 (6th Cir. 2005). Similarly, a defendant does not waive his right to appeal simply by agreeing to be sentenced under a particular *statute*.

Caruthers's plea agreement does, however, contain an explicit appeal waiver provision: "[T]he defendant knowingly waives the right to appeal any sentence within the maximum provided in the offense level as determined by the Court or the manner in which that sentence was determined on the grounds set forth in 18 U.S.C. § 3742 or on any ground whatever." J.A. at 183 (Plea Agreement ¶ 13). Caruthers argues that his appeal does not come within the literal terms of the waiver clause, especially in light of the principle that plea agreements are to be interpreted strictly, with ambiguities construed against the government. *See, e.g.*, *United States v. Fitch*, 282 F.3d 364, 367-68 (6th Cir. 2002); *United States v. Johnson*, 979 F.2d 396, 399 (6th Cir. 1992); *United States v. Gebbie*, 294 F.3d 540, 551-52 (3d Cir. 2002) (collecting cases). The principle of narrow construction in the face of ambiguities is inapplicable here because the waiver's text unambiguously encompasses Caruthers's sentence. The sentence of 180 months was "within the maximum provided in the offense level as determined by the Court," because the district court calculated an offense level of 30, which provides for a maximum sentence of 210 months for those with a criminal history category of VI. Moreover, the district court's decision to apply the mandatory minimum of the ACCA is literally an aspect of "the manner in which that sentence was determined." Therefore, the appeal waiver's text applies to Caruthers's sentence.

#### b. Enforceability of the Waiver Clause

Caruthers next contends that even if the waiver provision's language encompasses his appeal, it cannot as a matter of law preclude attacking a sentence on the grounds that it exceeds the statutory

---

[3]Caruthers does not deny that his agreement was knowing, voluntary, and intelligent. *See United States v. Fleming*, 239 F.3d 761, 763-64 (6th Cir. 2001); *United States v. Ashe*, 47 F.3d 770, 775-76 (6th Cir.), *cert. denied*, 516 U.S. 859 (1995).

maximum. Caruthers has cited no cases from this court addressing his argument, and it indeed appears to be a matter of first impression in this circuit.[4]

It is well settled in the federal courts that "a defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court." *United States v. Marin*, 961 F.2d 493, 496 (4th Cir. 1992). Pursuant to this principle, our sister circuits have uniformly taken the position that an appellate waiver may not bar an appeal asserting that the sentence exceeds the statutory maximum. *See, e.g.*, *United States v. Bownes*, 405 F.3d 634, 637 (7th Cir.) (Posner, J.), *cert. denied*, — U.S. —, 126 S. Ct. 320 (2005); *United States v. Hahn*, 359 F.3d 1315, 1327 (10th Cir. 2004) (en banc); *United States v. Andis*, 333 F.3d 886, 891-92 (8th Cir.) (en banc), *cert. denied*, 540 U.S. 997 (2003); *United States v. Teeter*, 257 F.3d 14, 25 n.10 (1st Cir. 2001); *United States v. Phillips*, 174 F.3d 1074, 1076 (9th Cir. 1999); *United States v. Bushert*, 997 F.2d 1343, 1350 n.18 (11th Cir. 1993), *cert. denied*, 513 U.S. 1051 (1994); *Marin*, 961 F.2d at 496; *see also United States v. Khattak*, 273 F.3d 557, 563 (3d Cir. 2001); *United States v. Rosa*, 123 F.3d 94, 100 & n.5 (2d Cir. 1997). *Cf. United States v. Hollins*, 97 F. App'x 477, 479 (5th Cir. 2004) (per curiam) ("[A] § 2255 waiver does not preclude review of a sentence that exceeds the statutory maximum.").[5]

These courts offer several different rationales for the doctrine. Some suggest that a district court is without jurisdiction to impose a sentence exceeding the statutory maximum, *Bushert*, 997 F.2d at 1350 n.18 ("It is both axiomatic and jurisdictional that a court of the United States may not impose a penalty for a crime beyond that which is authorized by statute."); *see also Andis*, 333 F.3d at 886 (calling a supramaximal sentence "illegal"), which means that the unenforceability of the waiver is simply an application of the general rule that jurisdictional defects may not be waived. Other courts invoke notions of due process. *See Bownes*, 405 F.3d at 637 ("[S]ome minimum of civilized procedure is required by community feeling regardless of what the defendant wants or is willing to accept." (internal quotation marks omitted)); *Marin*, 961 F.2d at 496 ("[A] defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court."). Still others use the term "miscarriage of justice," *Hahn*, 359 F.3d at 1327; *Khattak*, 273 F.3d at 563; *Teeter*, 257 F.3d at 25, which seems implicitly to invoke both the unconscionability doctrine of contract law (since plea agreements are contracts) and the supervisory power of the courts of appeals. We need not choose from among these justifications, because no matter what the theory, the general soundness of the doctrine is apparent. Thus, we agree with our unanimous sister circuits that an appellate waiver does not preclude an appeal asserting that the statutory-maximum sentence has been exceeded.

The question then becomes whether Caruthers's appeal can accurately be called a challenge of his sentence on the grounds that it exceeds the statutory maximum. The argument for such a characterization is that being a felon in possession of a firearm and being an armed career criminal in possession of a firearm are two separate offenses. Under this view, the baseline statutory maximum for purposes of the waiver inquiry is the ten-year maximum for being a felon in

---

[4]This development (or lack thereof) appears to be an artifact of the language used in many of the appellate waivers in this circuit, which explicitly permit appeals of sentences exceeding the statutory maximum. *See, e.g.*, *United States v. Luebbert*, 411 F.3d 602, 603 (6th Cir. 2005) (quoting the plea agreement, which provided that "[t]he defendant additionally waives the right to appeal his sentence on any ground . . . *other than any sentence imposed in excess of the statutory maximum* . . . ." (emphasis added) (first omission in original)), *cert. denied*, — U.S. —, 126 S. Ct. 1178 (2006).

[5]The circuits have been similarly uniform in accepting the principle that defendants who have otherwise waived their appellate rights may yet attack sentences based on constitutionally impermissible criteria like race. *See, e.g.*, *Bownes*, 405 F.3d at 637. The soundness of this rule is incontrovertible, and the fact that it is often paired with the doctrine we consider today lends support to the latter. To paraphrase a familiar adage from another context: "a [doctrine] is known by the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).

possession of a firearm, *see* 18 U.S.C. § 924(a)(2), and Caruthers's fifteen-year sentence exceeded it. The argument against such a characterization is that being a felon in possession of a firearm and being an armed career criminal in possession of a firearm are *not* two separate offenses, but simply recidivism-contingent variants of the same offense. Under this view, the baseline statutory maximum for purposes of the waiver inquiry is the life-imprisonment maximum for being an armed career criminal in possession of a firearm, *see* 18 U.S.C. § 924(e)(1); *United States v. Wolak*, 923 F.2d 1193, 1199 (6th Cir.), *cert. denied*, 501 U.S. 1217 (1991), and Caruthers's fifteen-year sentence did not exceed it.

Unfortunately, neither party briefed or argued this issue. (Indeed, the government did not bother to address Caruthers's enforceability argument at all.) In any event, we need not determine whether Caruthers's appeal qualifies as a challenge on the grounds that his sentence exceeds the statutory maximum, because, for the reasons discussed below, it fails on the merits. Thus, we assume for present purposes that Caruthers's appellate waiver is unenforceable, and we now turn to the merits of Caruthers's sentencing argument.[6]

---

[6]We acknowledge that we have said that a valid appellate waiver leaves this court without jurisdiction to hear a sentencing appeal. *United States v. McGilvery*, 403 F.3d 361, 362-63 (6th Cir. 2005). This might suggest that reaching the merits by assuming that Caruthers's appellate waiver is unenforceable is tantamount to reaching the merits by assuming jurisdiction, an approach that the Supreme Court has disapproved, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-101 (1998), at least with respect to Article III jurisdiction, *see, e.g.*, *Penobscot Nation v. Georgia-Pacific Corp.*, 254 F.3d 317, 324 (1st Cir. 2001) (Boudin, J.) (suggesting that *Steel Co.*'s mandatory order of disposition might be limited to Article III questions), *cert. denied*, 534 U.S. 1127 (2002). *But see, e.g.*, *Phillips v. Ameritech Info. Sys., Inc.*, No. 97-1942, 1999 WL 96650, at *2 n.1 (6th Cir. Feb. 5, 1999) (unpublished opinion) (noting that a majority of the Justices agreed that in certain circumstances assuming jurisdiction is appropriate, so long as the jurisdictional issue is difficult and resolving the case on the merits favors the party contesting jurisdiction); *Bowers v. NCAA*, 346 F.3d 402, 416 n.14 (3d Cir. 2003) (same); *Ctr. for Reprod. Law v. Bush*, 304 F.3d 183, 194 n.5 (2d Cir. 2002) (same).

There are several reasons, however, to read *McGilvery* for less than all it might be worth. First, we have, both before and after *McGilvery*, affirmed sentences challenged by defendants who had validly waived their appeals. *See United States v. Dillard*, 438 F.3d 675, 684-85 (6th Cir. 2006); *United States v. Yoon*, 398 F.3d 802, 808 (6th Cir.), *cert. denied*, — U.S. —, 126 S. Ct. 548 (2005); *United States v. Sykes*, 292 F.3d 495, 498 (6th Cir.), *cert. denied*, 537 U.S. 965 (2002). By affirming rather than dismissing the appeals, we necessarily exercised jurisdiction in these cases, suggesting that an appellate waiver does *not* divest this court of jurisdiction. To the extent that *McGilvery* conflicts with the earlier decisions, we are bound by the prior cases. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985); 6TH CIR. R. 206(c) (a later panel cannot overrule a prior panel's published opinion). Second, *McGilvery* cited no authority for its jurisdictional characterization, while the en banc Tenth Circuit has articulated powerful reasons for concluding that even when defendants validly waive their appeals, the courts of appeal do indeed have jurisdiction under both the relevant statutes (28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1)) and Article III. *See Hahn*, 359 F.3d at 1320-24.

Finally, the Supreme Court has recently and repeatedly admonished courts not to be cavalier in their use of the term "jurisdictional." *See Arbaugh v. Y & H Corp.*, — U.S. —, 126 S. Ct. 1235 (2006); *Eberhart v. United States*, — U.S. —, 126 S. Ct. 403 (2005) (per curiam); *Scarborough v. Principi*, 541 U.S. 401, 413-14 (2004); *Kontrick v. Ryan*, 540 U.S. 443 (2004); *accord Cobb v. Contract Transp., Inc.*, — F.3d —, No. 05-6196, 2006 WL 1749628, at *3-*5 (6th Cir. June 9, 2006); *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 517-20 (6th Cir. 2006). Although these decisions admittedly involved different contexts, at least two principles articulated therein apply with force here. First, "*[o]nly Congress* may determine a lower federal court's subject-matter jurisdiction." *Kontrick*, 540 U.S. at 452 (emphasis added). Congress established appellate jurisdiction over criminal appeals via 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and, under this principle, a defendant may not destroy that jurisdiction by agreeing to an appellate waiver. Second, "[c]larity would be facilitated if courts and litigants used the label 'jurisdictional' not for *claim-processing rules*, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." *Kontrick*, 540 U.S. at 455 (emphasis added). The enforcement of appellate waivers fits comfortably in the rubric of a mere claim-processing rule — as we recognized in *McGilvery*, 403 F.3d at 363 (encouraging the government to file in this court a motion to dismiss the appeal whenever the defendant has agreed to an appellate waiver, as it would facilitate referral to a motions panel) — and therefore should not be labeled "jurisdictional."

For these reasons, we conclude that our assumption that Caruthers's appellate waiver is unenforceable does not constitute an impermissible assumption of jurisdiction.

## 2. Standard of Review

"This Court reviews a district court's conclusion that a crime constitutes a violent felony under the ACCA . . . *de novo*." *United States v. Hargrove*, 416 F.3d 486, 494 (6th Cir. 2005). As both parties recognize, however, because Caruthers did not raise his sentencing objection before the district court, it is reviewed for plain error. FED. R. CRIM. P. 52(b). To satisfy the plain error standard, "there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (alterations in original) (citations and internal quotation marks omitted).

## 3. Merits

### a. Burglaries as Violent Felonies Under the ACCA

A person convicted of being a felon in possession of a firearm under § 922(g)(1) generally is subject to a *maximum* prison term of ten years. 18 U.S.C. § 924(a)(2). If that person has three or more prior convictions for "serious drug offense[s]" or "violent felon[ies]" (in any combination), however, the ACCA makes him subject to a sentence enhancement that imposes a mandatory *minimum* prison term of fifteen years. *Id.* § 924(e)(1). A crime qualifies as a "violent felony" for purposes of the enhancement if it is punishable by more than one year in prison and either "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another" or "(ii) is *burglary*, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." *Id.* § 924(e)(2)(B) (emphasis added).

The district court applied § 924(e) to Caruthers on the basis of four prior felony convictions in Tennessee: two for third-degree burglary, one for second-degree burglary, and one for a serious drug offense. Caruthers argues that § 924(e)'s definition of "violent felony" encompasses neither second- nor third-degree burglary as they existed in Tennessee at the time of his convictions, leaving him with fewer than three qualifying predicate offenses and making the application of the ACCA enhancement erroneous.

In *Taylor v. United States*, 495 U.S. 575 (1990), the Supreme Court delineated the meaning of "burglary" in § 924(e)(2)(B)(ii). The Court explained that Congress adopted a "generic" definition of burglary: "any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Id.* at 599. Generally, a court is to determine whether a defendant was convicted of generic burglary by "look[ing] only to the fact of conviction and the statutory definition of the prior offense." *Id.* at 602. If the statutory definition of burglary is nongeneric, however, the inquiry shifts to whether the defendant "actually committed a generic burglary." *Id.* at 599-600. Where, as here, the burglary conviction flows from a guilty plea, this inquiry "is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Shepard v. United States*, 544 U.S. 13, 125 S. Ct. 1254, 1263 (2005).

### b. Application to the Pre-November-1989 Tennessee Burglary Statute

Caruthers argues that the burglary statute under which he was convicted did not require *unlawful* entry, one of the *Taylor* generic-burglary elements. Such an argument would appear to have no merit with respect to Tennessee's current burglary statute, which includes the element of acting "without the effective consent of the property owner." TENN. CODE ANN. § 39-14-402(a).

However, Caruthers was convicted of offenses occurring before the current statute went into effect on November 1, 1989.[7]  The second-degree burglary statute then in effect provided in relevant part:

> Burglary in the second degree is the breaking and entering into a dwelling house or any other house, building, room or rooms therein used and occupied by any person or persons as a dwelling place or lodging either permanently or temporarily and whether as owner, renter, tenant, lessee or paying guest, by day, with the intent to commit a felony.

TENN. CODE ANN. § 39-3-403(a) (1982).  Third-degree burglary was defined as "the breaking and entering into a business house, outhouse, or any other house of another, other than dwelling house, with the intent to commit a felony."  *Id.* § 39-3-404(a)(1).

We first address whether Tennessee's pre-November-1989 burglary statute is generic.[8] Caruthers is correct that a burglary statute that fails to include unlawful entry as a distinct element is not generic.  *See United States v. Maness*, 23 F.3d 1006, 1008-09 (6th Cir.), *cert. denied*, 513 U.S. 906 (1994).  Caruthers is incorrect, however, in asserting that the statute did not require an unlawful entry.  The Tennessee courts have held otherwise.  *See Goins v. State*, 237 S.W.2d 8, 11 (Tenn. 1951) ("It cannot be doubted that where the owner of a building invites another to enter for a lawful purpose, making the keys available for a peaceable entry, and a felony is committed, it is no burglary."); *Page v. State*, 98 S.W.2d 98, 98-99 (Tenn. 1936) (holding that the defendant committed burglary by unlawfully breaking and entering a room with intent to commit a felony, even though he was lawfully on the premises); *State v. Puryear*, No. 88-190-III, 1989 WL 28312, at *1 (Tenn. Crim. App. Aug. 14, 1989); *State v. Funzie*, No. 28, 1986 WL 3540, at *1 (Tenn. Crim. App. Mar. 19, 1986).  Even the case on which Caruthers relies required an unlawful entry; it just happened to involve an unlawful entry into a payphone's coin receptacle.  *Fox v. State*, 383 S.W.2d 25, 27 (Tenn. 1964), *cert. denied*, 380 U.S. 933 (1965).  Thus, the pre-November-1989 burglary statute is generic along the unlawful-entry dimension.

Yet a burglary statute may also be nongeneric if it "includ[es] places, such as automobiles and vending machines, other than buildings."  *Taylor*, 495 U.S. at 599.  The Tennessee burglary statute was indeed nongeneric along the "building or structure" dimension, as it permitted third-degree burglary convictions for unlawful entry into coin receptacles and the like.  *Fox*, 383 S.W.2d

---

[7]Caruthers was convicted of second-degree burglary committed in 1984 and of third-degree burglaries committed in 1983 and on September 1, 1989.

[8]We have not squarely addressed this issue.  Unfortunately, the two times we came close to answering the question, we reached different conclusions.  First, in *United States v. Anderson*, 923 F.2d 450 (6th Cir.), *cert. denied*, 499 U.S. 980 and 500 U.S. 936 (1991), we held that Tennessee's definition of burglary is "generic" but did not specify the version of the statute to which we were referring.  *Id.* at 454.  It is *likely* but not *certain* that the pre-November-1989 burglary statute (i.e., the version under which Caruthers was convicted) was at issue in *Anderson*.

In the second case, we clearly identified the version of the statute we examined, and it was identical to the definition under which Caruthers was convicted.  *Compare United States v. Bureau*, 52 F.3d 584, 592 (6th Cir. 1995) ("In 1975, burglary in the third degree was defined under Tennessee law as: 'the breaking and entering into a business house, outhouse, or any other house of another, other than a dwelling house, with the intent to commit a felony.'" (quoting TENN. CODE ANN. § 39-904)), *with* TENN. CODE ANN. § 39-3-404(a)(1) (1982) ("Burglary in the third degree is the breaking and entering into a business house, outhouse, or any other house of another, other than dwelling house, with the intent to commit a felony.").  We observed that the statute was "broader than the generic definition in *Taylor* in that it omits the requirement of 'unlawful' entry and includes places other than a building."  *Id.* at 593 n.6.  This statement was dictum, however, as the question actually addressed was whether the defendant's attempted burglary conviction could serve as a predicate "violent felony" under the ACCA's "otherwise" clause.  *Id.* at 591 (answering in the affirmative).

Finally, we note that the Eighth Circuit held the statute in effect in 1966 to be generic, *United States v. Moore*, 108 F.3d 878, 880 (8th Cir. 1997), but it did so without any helpful analysis.

at 27; TENN. CODE ANN. § 39-3-404(b)(1) (1982) (encompassing "any vault, safe, or other secure place"). Thus, we turn to whether Caruthers "actually committed a generic burglary," *Taylor*, 495 U.S. at 600, according to "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information," *Shepard*, 125 S. Ct. at 1263.[9]

The record contains the indictments of only two of Caruthers's three burglary convictions,[10] but the absence of the third does not affect our analysis because the ACCA requires only three qualifying convictions and Caruthers does not dispute that his prior drug conviction qualifies. These indictments alleged that Caruthers unlawfully broke and entered a "business house" and a "dwelling house," respectively, J.A. at 282, 288, which means that he was actually convicted of burglarizing buildings, even though the statute permitted convictions for burglary of non-buildings.

In light of this conclusion, Caruthers was actually convicted of offenses including "the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime," i.e., generic burglaries. *Taylor*, 495 U.S. at 599; *see also Maness*, 23 F.3d at 1009-10. Therefore, the district court properly applied the ACCA sentencing enhancement.

## III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's denial of Caruthers's motion to suppress and **AFFIRM** Caruthers's sentence.

---

[9]Because the statute is nongeneric only in the sense that it permitted burglaries of non-buildings, we need only look for the "building or structure" element in the indictments and related documents. In other words, because we have already determined that the statute itself requires unlawful entry, we need not search for the unlawful-entry element in Caruthers's indictments.

[10]The information regarding the third burglary conviction is contained in a "Classification Report" prepared by the state corrections department. J.A. at 313. We are not satisfied that this document is a "comparable judicial record of [the] information" contained in the indictment. *Shepard*, 125 S. Ct. at 1263.

---

**CONCURRENCE**

---

McKEAGUE, Circuit Judge, concurring.  I join the majority opinion in full, but write separately to address two points related to the discussion of whether Caruthers's waiver of appellate rights with regard to his sentencing argument was enforceable.  First, the majority opinion states that one court, in dicta, has held that a defendant cannot waive the right to appeal a sentence above the statutory maximum because a district court is without jurisdiction to impose such a sentence.  This decision misconceives the nature of jurisdiction.  A district court either has jurisdiction to sentence a defendant or does not have such jurisdiction.[1]  A sentence imposed above the statutory maximum would certainly be legal error, but saying that a judge is wrong is not the equivalent of saying that a judge has acted beyond his or her jurisdiction.  Fortunately, the majority opinion wisely refrains from relying on the jurisdictional rationale in support of its assumption in this case that Caruthers's appellate waiver is unenforceable.

Second, while I agree with the approach of avoiding resolution of the waiver issue, both because it was not adequately addressed by the parties and because it is unnecessary to resolve it in this case, I write separately to briefly note my view on the issue.  I do not believe that Caruthers's appeal of his sentence should be characterized as a challenge on the grounds that it exceeds the statutory maximum.  Instead, I adhere to the view that being a felon in possession of a firearm and being an armed career criminal in possession of a firearm are not two separate offenses, but simply recidivism-contingent variants of the same offense, and therefore the statutory maximum of this offense is life.[2]

---

[1]In this case, the district court had jurisdiction to sentence Caruthers pursuant to 18 U.S.C. § 3231 which provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."

[2]I further note that where ACCA status is an issue, district courts are required to advise the defendant that the statutory maximum is life.  *See* Fed. R. Crim. P. 11(b)(1)(H) (requiring the trial court to ascertain that a defendant understands "any maximum *possible* penalty" before accepting a guilty plea (emphasis added)).