NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0668n.06

**No. 08-5429**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Nov 01, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| **MARVIN JEROME JOHNSON**, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |
| | ) | |

BEFORE:     MARTIN, COLE, CLAY, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge**. Defendant-Appellant Marvin Jerome Johnson appeals the denial of his motion to suppress a firearm seized during a *Terry* stop on the ground that the police did not have reasonable suspicion to detain and search him. For the reasons below, we **AFFIRM**.

**I.**

Around 10:00 p.m. on April 2, 2006, Johnson, his girlfriend, and a friend went to a public club in Columbia, Tennessee called "Club Karma" that was serving liquor that evening. The day was notable because it was Mule Day, an annual festival in Columbia known for drinking and revelry. A history of violence, including firearm-related offenses, surrounded Mule Day.

Johnson and his companions arrived at the club in a Ford Expedition and parked in the parking lot next to the club. They entered Club Karma and remained inside for several hours. While

Johnson was inside Club Karma, the Columbia Police Department SWAT Team investigated the parking lot outside of Club Karma, looking through the windows of automobiles for visible firearms. Peering in the window of the Ford Expedition in which Johnson arrived, Detective Jeremy Thomas Alsup saw an open gym bag on the floor of the front passenger seat. The bag contained a box of ammunition. Detective Alsup could not recall the caliber of the ammunition, and could not determine if there were bullets in the box or if it was empty. He relayed the presence of this box of ammunition to the other officers, and that information eventually reached Detective Frank Jeffrey Duncan.

At some point after midnight, two SWAT Team officers observed Johnson and his companions leaving Club Karma and walking towards the Ford Expedition. Johnson went to the front passenger side of the automobile—where the box of ammunition was located—and opened the door. The officers then confronted Johnson and his companions, ordering them to keep their hands visible. Johnson and his companions complied with this command. Detective Duncan assisted the officers, approaching Johnson and patting him down. As a result, Detective Duncan found a firearm in Johnson's belt. SWAT Team officers then arrested Johnson.

Johnson was subsequently prosecuted for being a convicted felon in possession of a firearm. Johnson moved to suppress the firearm as the fruit of an illegal search, but the district court denied his motion after a suppression hearing. Johnson then entered a conditional guilty plea maintaining his ability to appeal the district court's denial of his motion to suppress. The district court sentenced Johnson to forty-eight months of imprisonment. Johnson timely appealed the denial of his motion.

**II.**

In examining the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo. *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004). We must view the evidence "in the light most likely to support the district court's decision." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (internal quotation omitted). Particularly in the context of *Terry* stops, we give "due weight" to the district court's inferences, as it "is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions." *Foster*, 376 F.3d at 583 (internal quotation omitted).

We have articulated a two-part process for evaluating the constitutionality of *Terry* stops: We first determine "whether there was a proper basis for the stop"; then, if the stop was proper, we assess "whether the degree of intrusion was reasonably related in scope to the situation at hand." *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006) (internal quotations and citations omitted).

**A. Basis for the Stop**

A *Terry* stop is a "brief investigatory stop[] of persons," *United States v. Cambell*, 549 F.3d 364, 370 (6th Cir. 2008) (internal quotation omitted), that is justified under the Fourth Amendment when an officer has reasonable suspicion "to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). We look to the hypothetical reasonable officer's assessment of a situation, because a *Terry* stop requires a "particularized and objective basis for suspecting the particular person of criminal activity." *Cambell*, 549 F.3d at 371 (internal quotation omitted). We determine whether reasonable suspicion exists based on the totality of the circumstances. *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001).

Here, the government argues that Tennessee Code section 39-17-1305 (2006) provided the officers with reasonable suspicion to stop Johnson. That law prohibited "a person [from] possess[ing] a firearm within the confines of a building open to the public where liquor, wine or other alcoholic beverages . . . are served for on premises consumption." Tenn. Code § 39-17-1305 (2006). Because Johnson does not contest that Club Karma was a public establishment serving alcohol, the only question is whether the police had reasonable suspicion to believe Johnson possessed a firearm in Club Karma.

The relevant facts are: (1) the presence of a box of ammunition in the automobile; (2) the location of the automobile in the parking lot of a public establishment serving alcohol; (3) the time of day; and (4) the history of alcohol consumption and firearm-related violence on Mule Day. While a time of day or dangerous location cannot alone provide reasonable suspicion, "police officers are not required to ignore the relevant characteristics of a location [or time] in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *United States v. Pearce*, 531 F.3d 374, 383 (6th Cir. 2008) (internal quotation omitted).

Moreover, we have noted that the presence of a box of ammunition in an automobile—albeit confirmed through inquiry—is adequate to provide reasonable suspicion that the owner possesses a firearm. *See United States v. Isham*, 501 F.2d 989, 990-91 (6th Cir. 1974). In *Isham*, an arrestee asked to lock his automobile before police officers transported him to jail. *Id.* at 990. Monitoring the arrestee, the officers saw a box of ammunition on the front seat and asked the arrestee if he had a gun. *Id.* He said that he did. *Id.* Analyzing this exchange, we noted: "The police *suspicion* about a weapon (based on the plain view of the ammunition) was . . . *turned into something more than*

*probable cause* when [the arrestee] admitted that he had a [firearm]." *Id.* at 991 (emphasis added); *accord United States v. Meadows*, 571 F.3d 131, 142 (1st Cir. 2009) ("We think it uncontroversial that the discovery of ammunition—but not a gun—in the car from which a suspect fled could . . . lead an officer to reasonably suspect that the fleeing suspect possessed the gun that went with the ammunition.").

Johnson protests, arguing that the circumstances did not warrant a belief that he was behaving in a suspicious or dangerous manner. Johnson objects to the adequacy of the factors here, in particular the background of Mule Day and the connection between the box of ammunition and the firearm. However, "individual factors, taken as a whole, [may] give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *Smith*, 263 F.3d at 588. Furthermore, the factors combined needed only provide the officers with *reasonable* suspicion that Johnson violated the prohibition on carrying a firearm into an establishment serving alcohol. This level of suspicion "is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *Cambell*, 549 F.3d at 370-71 (internal quotation omitted).

Given this standard, we find that the circumstances here provided the officers with reasonable suspicion to believe Johnson carried a firearm into Club Karma, in violation of Tennessee Code section 39-17-1305 (2006).

**B. Degree of Intrusion**

The second half of our *Terry* stop analysis requires us to determine whether the officers' intrusion "was reasonably related in scope to the situation at hand." *Caruthers*, 458 F.3d at 464

(internal quotation omitted). We do so "by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.* (internal quotation omitted).

During a *Terry* stop, an officer may perform "a reasonable search for weapons for the protection of the police officer." *Terry*, 392 U.S. at 27. This search must be based on the officer's "belie[f] that he is dealing with an armed and dangerous individual." *Id.* The officer, however, need not be "absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

Because the statutory violation at issue involves a firearm, the sole question is whether a "reasonably prudent man in the circumstances" would consider Johnson dangerous. *Id.* We have found the believed presence of a firearm central in permitting a protective search of a suspect due to a reasonable officer's fear of danger. *See United States v. Paulino*, 935 F.2d 739, 747 (6th Cir. 1991), *superseded by statute on other grounds*, U.S. Sentencing Guidelines Manual § 3B1.1. The Supreme Court has agreed that "danger may arise from the possible presence of weapons in the area surrounding a suspect." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); *see also id.* at 1048 ("[W]e have also expressly recognized that suspects may injure police officers and others by virtue of their access to weapons . . . ."). This conclusion is further justified when the hour is late and alcohol may be involved. *See id.* at 1050. Given the suspected possession of a firearm and the circumstances outside Club Karma that night, a reasonable individual would have feared for his safety in confronting Johnson.

Those same safety considerations render Detective Duncan's action—frisking without first asking questions—reasonable. *See Caruthers*, 458 F.3d at 469 ("[T]he stop was weapons-related, so it was reasonable for [the officer] to secure [the defendant] for safety reasons . . . ."); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) ("Courts have generally upheld law enforcement actions taken during investigatory stops, including making such stops with weapons drawn, when those actions are reasonably necessary for the protection of the officers." (internal quotations omitted)); *cf. Isham*, 501 F.2d at 990-91 (police questioned defendant *in custody* about presence of firearm after finding box of ammunition).

Because the officers had reasonable suspicion to believe Johnson was armed and dangerous, they could properly pat him down for weapons. *Terry*, 392 U.S. at 27. The officers thus did not violate Johnson's Fourth Amendment rights, so the firearm need not be suppressed. *See Pearce*, 531 F.3d at 383-84.

**III.**

For the foregoing reasons, we **AFFIRM** the district court's denial of Johnson's motion to suppress.