*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0103p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 07-5202

JONATHAN KEITH,

*Defendant-Appellant.*

─────────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 06-00038—David L. Bunning, District Judge.

Argued: January 16, 2009

Decided and Filed: March 18, 2009

Before: KENNEDY, COLE, and GILMAN, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Kevin M. Schad, SCHAD & SCHAD, Lebanon, Ohio, for Appellant. Robert Kennedy McBride, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee. **ON BRIEF:** Kevin M. Schad, SCHAD & SCHAD, Lebanon, Ohio, for Appellant. Robert Kennedy McBride, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEYS, Lexington, Kentucky, for Appellee.

COLE, J., delivered the opinion of the court, in which GILMAN, J., joined. KENNEDY, J. (pp. 11-17), delivered a separate dissenting opinion.

─────────────────

**OPINION**

─────────────────

COLE, Circuit Judge. Jonathan Keith pleaded guilty to several counts, including possession of crack cocaine with intent to distribute and possession of a firearm in furtherance of drug-trafficking. He reserved the right to appeal the district court's denial of his motion to suppress evidence obtained as a result of an investigatory *Terry* stop. He

1

claims that the officer who stopped him lacked the requisite reasonable suspicion of criminal conduct. He also asserts that the district court committed errors at sentencing. For the following reasons, we **REVERSE** the district court's denial of Keith's motion to suppress evidence. This renders the sentencing issues moot.

## I. BACKGROUND

At 1:45 a.m. on March 29, 2006, Newport, Kentucky police officers Gregory Ripberger and Leonard Stephens were on patrol. They had just finished assisting with an arrest (unrelated to this case) and were standing on a corner next to multiple marked police cars with their lights flashing. On the opposite corner of the intersection, about fifty yards away, was "Big Daddy's" liquor store. The officers could see the two sides of the building facing the intersecting streets: one side was the front of the store, and the other side contained a drive-through window sheltered by an overhang. They were not surveilling Big Daddy's in particular, but the officers could see the store clearly. Their unit dealt frequently with narcotics crimes, and the officers knew that, in addition to the standard liquor-store fare, Big Daddy's sold certain items that could be used to smoke crack cocaine, including filters and glass vials. Officer Ripberger had effected narcotics arrests in the surrounding area before, and, based on his "experience and training as a Newport police officer," he considered "Big Daddy's and [its] parking lot to be a high drug trafficking crime area." (Joint Appendix "JA" 74.)

As they stood on the corner, the two officers observed a man on foot, later identified as Brandon Crawford, approach a car that had pulled up to the Big Daddy's drive-through window. Another man, later identified as Keith, was in the driver's seat of the car. Officer Ripberger testified that Crawford "walked up to the vehicle and appeared to start talking to the driver, stuck his head inside the [passenger-side window of] the vehicle, and at one point in time he looked back at us and then removed himself from the vehicle that he was leaning into." (JA 77, 97.) His head was in the car "[j]ust a few brief seconds." (JA 78.) The car then pulled away from the drive-through window. The testimony of Officer Ripberger suggests that Keith did not pull out of the drive-through line prior to reaching the drive-through window: "[Crawford] approached a silver Pontiac that was parked in the drive-through *at the window*." (JA 77-78 (emphasis added).) Additionally, Officer Stephens

stated twice that he was uncertain whether Keith had purchased something in the drive-through; if Keith had pulled out of line prior to reaching the window, Officer Stephens would have been certain that Keith had not purchased anything. Rather than leaving the parking lot through an exit near the drive-through window, Keith turned and drove across the parking lot in front of Big Daddy's, turned again at the corner of the building, and proceeded along the side of the store, which the officers could not see from their vantage point. The officers were aware that there were parking places and a dumpster located on that side of Big Daddy's.

At the suppression hearing, the officers repeatedly spoke of Keith going "behind" Big Daddy's, but the south side of the building, which is where the officers lost sight of Keith, is more accurately described as the "side" of the Big Daddy's because the building's facade faces westward onto Central Avenue. Keith was only "behind" Big Daddy's from the perspective of the officers, who were looking at the store from the northwest. As Keith was driving around the building, Crawford also walked across the front of Big Daddy's toward the south side of the building, and, while doing so, he looked in the officers' direction again. Officer Ripberger interpreted this as an attempt "to see what [the officers] were doing." (JA 78-79.) When Crawford reached the corner of the building he turned, and the officers lost sight of him on the far side of the building. Officer Stephens testified that Keith's car was out of their sight for "a few seconds," and Crawford was out of sight for "[j]ust a few seconds." (JA 123-24, 132.) In his incident report, Officer Ripberger stated that Crawford was out of sight and then appeared again "within seconds." (JA 102.) Ripberger testified that Keith's car was out of sight for approximately fifty seconds. (JA 102.) Both officers acknowledged that they did not know if the two men had any contact on the far side of the building. Officer Ripberger testified that he and Officer Stephens suspected that the two men had met on the side of the building to engage in a drug deal or exchange alcohol that had been purchased for someone under age. Accordingly, the officers entered their respective patrol cars intending to confront the two individuals.

When Keith's car emerged from the far side of the building, it exited the parking lot and drove into the street. Officer Ripberger followed Keith and stopped his car, based solely on his suspicion that some kind of criminal activity had occurred in the few seconds that the officers had lost sight of Keith and Crawford (Keith did not commit any kind of traffic

infraction). Officer Ripberger then ran a check on Keith's driver's license and learned that it was suspended. He also viewed what appeared to be marijuana in plain sight in the car. A subsequent search of Keith's car revealed a gun, and a later body-cavity search revealed approximately 19.8 grams of cocaine base hidden in Keith's rectum. Officer Stephens conducted a separate stop of Crawford, found nothing suspicious on him, and allowed him to go.

Keith was charged in a five-count indictment with: 1) possession with intent to distribute crack cocaine; 2) possession of a firearm by a convicted felon; 3) possession of a firearm in furtherance of drug-trafficking; 4) forfeiture of firearm and currency; and 5) forfeiture of firearm. Claiming that Officer Ripberger did not have reasonable suspicion to believe that he had engaged in criminal activity, Keith moved to suppress the fruits of the initial stop of his car. He did not challenge any of the officers' actions subsequent to the stop and does not make any such challenge on appeal. A magistrate judge issued a Report and Recommendation denying the motion to suppress, and the district judge adopted the Report and Recommendation in full. Keith entered a conditional guilty plea, reserving the right to appeal the denial of his suppression motion.

## II. ANALYSIS

### A.　Standard of review

In reviewing a district court's decision on a motion to suppress, we review factual findings for clear error and the application of the law to those findings de novo. *United States v. Garcia*, 496 F.3d 495, 502 (6th Cir. 2007). We "'must consider evidence in the light most likely to support the district court's decision[.]'" *Id*. (quoting *United States v. Marxen*, 410 F.3d 326, 328 (6th Cir. 2005)). Keith does not challenge the facts as stated by the magistrate judge and the district court—the issue before us is the application of the law to those facts.

### B.　Legal standard for existence of reasonable suspicion

A *Terry* stop is permissible only if law enforcement officers had a "particularized and objective basis for suspecting the particular person stopped of criminal activity," *United States v. Cortez*, 449 U.S. 411, 417-18 (1981), and "were aware of specific and articulable

facts which gave rise to reasonable suspicion." *United States v. Davis*, 514 F.3d 596, 608 (6th Cir. 2008) (internal quotation marks omitted). Reasonable suspicion does not materialize merely because a person "looked suspicious" and was in a "high drug problem area." *Brown v. Texas*, 443 U.S. 47, 49, 52 (1979); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). "An officer must not act on an 'inchoate and unparticularized suspicion or 'hunch,' but [on] the specific reasonable inferences [] which he is entitled to draw from the facts in light of his experience.'" *United States v. Urrieta*, 520 F.3d 569, 573 (6th Cir. 2008) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). We consider the totality of the circumstances to determine the reasonableness of the stop. *Id.*

In *United States v. Urrieta*, we reversed a district court's denial of a motion to suppress evidence in the context of a stop and detention of a motorist suspected of drug-trafficking. 520 F.3d at 579. Urrieta was driving a sports utility vehicle ("SUV") fully packed with belongings and towing another car packed similarly. *Id.* at 575. He had a Mexican driver's license, the SUV had an expired registration tag, and the two passengers in the SUV appeared nervous. *Id.* Urrieta misrepresented his immigration status to the deputy sheriff conducting the stop and said he could not find his passport. *Id.* The deputy sheriff claimed that these facts provided him with reasonable suspicion that Urrieta was transporting drugs. *Id.* We disagreed and held that the circumstances did not support such a finding. We noted that "[t]he Fourth Amendment simply does not allow a detention based on an officer's 'gut feeling' that a suspect is up to no good." *Id.* at 578.

In *United States v. Townsend*, 305 F.3d 537, 545 (6th Cir. 2002), we affirmed the district court's suppression of evidence based on a finding that officers lacked reasonable suspicion to detain a car for the arrival of drug-detection dogs after validly stopping the car for speeding. The government offered ten reasons to support its claim that the officers had reasonable suspicion that Townsend was transporting drugs, including that the stop occurred at 3:00 a.m., the passengers were overly cooperative and appeared nervous, the driver was not the owner of the car (although he was listed on the insurance), and the suspects' travel plans were slightly dubious. *Id.* at 542-45. We assessed the persuasiveness of each of the asserted reasons and then considered all the reasons together to determine whether they

amounted to reasonable suspicion of criminal activity. *Id*. There, we held that they did not because "[a]lthough the government has pointed to several factors . . . which we have recognized as valid considerations in forming reasonable suspicion, they are all relatively minor[,] and . . . this case lacks any of the stronger indicators of criminal conduct that have accompanied these minor factors in other cases." *Id*. at 545.

In *Patterson v. City of Cleveland*, which involved a 28 U.S.C. § 1983 claim rather a suppression motion, an officer whose unit specialized in "high crime drug areas" was on patrol around midnight when she saw two African-American men, about whom she had no information, "involved in some type of exchange . . . huddled together on the sidewalk." 1999 U.S. App. LEXIS 1203, at *2 (6th Cir. Jan. 21, 1999) (unpublished). The officer did not see anything exchanged, although one of the men "had his hands in a 'cup-like fashion.'" *Id*. When the police arrived, the two men "pulled their hands apart" and walked quickly up the street. *Id*. at *2-3. We held that "[t]hese facts, standing alone, would not allow a reasonable police officer to conclude that illicit activity was in progress," and we reversed a grant of summary judgment that had been based on a finding of qualified immunity. *Id*. at *19-20.

On the other hand, factors that appear innocent in isolation may combine to form circumstances that, as a whole, support a finding of reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273-75 (2002) (officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'" (quoting *Cortez*, 449 U.S. at 418)); *United States v. Sokolow*, 490 U.S. 1, 9 (1989). In addition, evasive behavior on the part of a suspect is a factor that may support a finding of reasonable suspicion. *See Wardlow*, 528 U.S. at 124 (unprovoked flight upon noticing the police in an area of heavy narcotics trafficking supports reasonable suspicion). While presence in a high crime area does not, on its own, create reasonable suspicion, it is "among the relevant contextual considerations." *Id*.

We have found reasonable suspicion in several cases with facts that, at first blush, seem somewhat similar to those at issue here. In *United States v. Green*, an unpublished

decision, we held that officers had reasonable suspicion to support an investigatory stop because although

> [a] solitary female might lawfully pause and lean toward the window of a stopped vehicle at 2:45 a.m. in an area known for drug trafficking and prostitution, and then decide to walk away as a squad car approached[,] . . . that possibility is so slight that a reasonable police officer encountering that situation can properly conclude that something illegal (most likely solicitation for prostitution) is afoot.

157 F. App'x 853, 856 (6th Cir. 2005); *see also United States v. Lewis*, 2000 U.S. App. LEXIS 3308, at *2-3 (6th Cir. Feb. 29, 2000) (finding reasonable suspicion where undercover officers observed two juveniles acting as "decoys" and then noticed defendant and others exiting a vehicle and "look[ing] nervous and frightened as if they desired to flee"). Similarly, in *United States v. Connally*, 1993 U.S. App. LEXIS 1090, at *5 (6th Cir. Jan. 15, 1993), we found that, although no single factor was sufficient, the following factors, in combination, provided reasonable suspicion for a stop: "the officers knew this was a high drug trafficking area; [] they had seen drug dealing taking place here before; [] the pedestrian had thrown something in the van upon seeing the police; and [] the pedestrian quickly walked away and the van quickly pulled away." Although unpublished decisions do not have precedential authority, *see United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007), they may be considered for their persuasive value in our analysis of "[t]he concept[] of 'reasonable suspicion,'" which "do[es] not permit of precise judicial definition and [is] dependent on circumstances." *Townsend*, 305 F.3d at 542. With this in mind, we turn to whether the facts known to Officer Ripberger at the time he stopped Keith were sufficient to create reasonable suspicion that Keith had been engaged in criminal activity.

**C.      The officers did not have reasonable suspicion of criminal activity**

In this case, although the officers were aware that Big Daddy's sold items that can be used in the consumption of crack cocaine, the suspects' encounter took place outside an open, operating business that sold a full range of legal products. Officer Ripberger agreed that there was nothing unusual about Keith patronizing Big Daddy's around 2:00 a.m. and that it is, in fact, "kind of a popular place" at that time. (JA 96.) While Officer Ripberger testified that, based on his experience and knowledge of the area, he considered the parking lot of Big Daddy's to be a location where drug-trafficking is likely to occur, he did not state

that he had actually made drug-related arrests in the parking lot or witnessed drug transactions there in the past.

Initially, Officer Ripberger thought it was "out of the ordinary" for a pedestrian to approach a car parked at the drive-through window and talk to the driver, although this carries little weight, as it was based on Ripberger's personal experience of having gone "through the drive-through several times and never [having] had someone come up to [his] window." (JA 115.) The officers then thought it suspicious that Crawford looked in their direction while talking to the man in the car and then looked toward them again while walking across the front of the building. This contributed to the officers' feeling that the two men intended to re-join each other out the officers' sight. However, it is entirely to be expected that, out of curiosity, Crawford's attention was drawn to the nearby police cars with flashing lights at that time of the night. Counsel for the Government conceded at oral argument that he, too, would likely have looked over toward the spectacle on the opposite corner.

The main factor that Officers Ripberger and Stephens found suspicious was that after Crawford had glanced in their direction, both Keith and Crawford moved to the far side of Big Daddy's. The officers interpreted this as evincing an intent to avoid police observation, but Keith's and Crawford's actions were more ambiguous than the examples of "evasion" that have contributed to findings of reasonable suspicion in other cases. *See United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003) (finding that "walking away from the police when they got out of their unmarked car constitutes a factor" so innocent as "to be outrightly dismissed" in assessing whether police had reasonable suspicion); *Patterson v. City of Cleveland*, 1999 U.S. App. LEXIS 1203, at *2-3 (finding no reasonable suspicion where, when suspects saw police arrive, they pulled their hands apart and departed up the street); *cf. Wardlow*, 528 U.S. at 124 (finding reasonable suspicion based on "headlong flight" from officers); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (finding reasonable suspicion where one suspect was overheard urging another to "get out of here" and suspect made movements suggesting attempt to flee); *United States v. Caruthers*, 458 F.3d 459, 462 (6th Cir. 2006) (finding reasonable suspicion where, after officer asked him to approach police car, defendant "took off real quick . . . semi-running" and "hunched down" against a wall); *United States v. Helm*, 85 F. App'x 475, 476 (6th Cir. 2004) (finding reasonable suspicion

where, in addition to other suspicious conduct, driver drove in an evasive manner); *Lewis*, 2000 U.S. App. LEXIS 3308, at \*2-3 (finding reasonable suspicion where officers recognized use of decoys and observed nervousness and an apparent desire to flee).

We are not convinced that the manner in which Keith and Crawford moved from one side of Big Daddy's to the other, combined with Crawford's two glances in the direction of the officers' flashing police lights, created reasonable suspicion of criminal conduct. The officers had no information about these two men nor any additional facts to support their claim of reasonable suspicion, other than the late hour and the "bad" neighborhood in which they were located. In *United States v. Paulette*, on which the dissent relies, the officers actually "observed [the defendant] and another individual engage in a hand-to-hand transaction." 457 F.3d 601, 602 (6th Cir. 2006). Here, Keith and Crawford did not exchange anything or attempt to hide any object from sight. *See, e.g.*, *Joshua v. DeWitt*, 341 F.3d 430, 443-44 (6th Cir. 2003) (rejecting state court's reliance on "furtive gestures" where record did not indicate that suspects engaged in any specific furtive conduct, such as "mov[ing] their bodies or arms to conceal anything"); *cf. Connally*, 1993 U.S. App. LEXIS 1090, at \*5 (finding reasonable suspicion, in part because an object was thrown into a van when police approached). Though their knowledge of the parking area on the far side of Big Daddy's led the officers to believe that Keith and Crawford would not have had any reason to go there, it was possible that Keith was indecisive about which exit from the parking lot to use or that one of the men wished to discard trash in the dumpster.

The *Green* case, in which a solitary woman leaned into a car at 2:45 a.m. in an area known for prostitution and then walked away when the police appeared, is also distinguishable. Although the officers' observations there were similar to those in this case, in *Green* the conversation itself constituted the suspected crime (soliciting prostitution), and the officers observed that conduct directly. Here, by contrast, the officers did not witness any act that arguably appeared to be illegal. Crawford and Keith could very well have been neighborhood acquaintances rather than drug traffickers, and Crawford might well have leaned into Keith's car window to greet him or to ask if he knew why police cars with flashing lights were gathered on the corner. The two men might have had no further contact in the parking lot on the opposite side of Big Daddy's, or they might have exchanged a few innocuous words.

Considering the totality of the circumstances, this sequence of events was insufficient to provide the officers with reasonable suspicion that a crime had been committed. Without more information, they were not justified in stopping Keith or Crawford. That the two men greeted each other in a "bad" neighborhood late at night, glanced toward flashing police lights, and then spent several seconds, during which they may or may not have had any contact, in a parking area beside an open, operating liquor store—a parking area that the police, from their vantage point, could not see—was not enough, under the Fourth Amendment, to justify the intrusion of a police stop. *See Terry*, 392 U.S. at 27 (an "unparticularized suspicion or 'hunch'" is not enough); *Urrieta*, 520 F.3d at 575 ("an officer's 'gut feeling' that a suspect is up to no good" is not enough).

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of Keith's motion to suppress and **REMAND** for proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

KENNEDY, Circuit Judge, dissenting.  Because I agree with the district court that Officer Ripberger had reasonable  suspicion to stop Keith's vehicle, I respectfully dissent. I would **AFFIRM** the district court's denial of Keith's motion to suppress the evidence obtained during his arrest and subsequent search of his car.

When reviewing the denial of a motion to suppress, "we must consider the evidence in the light most favorable to the government" in determining whether reasonable suspicion existed.  *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).  The Fourth Amendment permits a police officer to stop a vehicle if specific and articulable facts give him reasonable suspicion that an occupant is committing a crime.  *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968).  While more than an "unparticularized suspicion" or "hunch" that criminal activity is afoot is required, *Terry*, 392 U.S. at 27, the proof required to indicate reasonable suspicion is "less demanding" than that needed for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  To assess the validity of a *Terry* stop, the court considers the totality of the circumstances and "all of the information available to law enforcement officials at the time."  *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008)(citation omitted).  The experience of the law enforcement officer must be taken into account in determining whether his or her suspicion was reasonable, and we allow officers to make inferences from the information available to them that "might well elude an untrained person."  *United States v. Cortez*, 449 U.S. 411, 418 (1981).

A careful review of the factual scenario reveals those facts which led the magistrate judge to conclude, based on the photographic exhibits and officers' testimony, that Officer Ripberger had reasonable suspicion that criminal activity was afoot.  At 1:45 a.m. on March 29, 2006, Officers Gregory Ripberger and Leonard Stephens were standing at the northwest corner of Fourth Street ("Fourth") and Central Street ("Central") in Newport, Kentucky, just after assisting with an unrelated arrest.   Officer Ripberger had been a member of the Newport Police Department for six years.    He observed the activity along with Officer Stephens, who had been with the Newport Police Department for fourteen years.    Both

officers were members of a "directed patrol" unit that focused on "problem areas within the city, one being narcotics." The magistrate judge found the testimony of both officers to be credible, and the district court adopted the magistrate judge's report. On the opposite corner from where the officers and their lighted cruisers were located stood Big Daddy's, a liquor store with a drive-up window. The drive-through lane ran parallel to Fourth Street, from East to West. There were several exits from Big Daddy's: two exits onto Fourth, one just before the entrance to the drive-through lane and one just past the exit of the drive-through lane, and a third exit which allowed cars to exit the drive-through directly onto Central. The store is located in a "high drug trafficking crime area" and both officers knew that the store sold items used in the consumption of narcotics, such as "small glass vials" and "Chore Boys," which are household items commonly used as filters for smoking crack cocaine.

The parking lot of Big Daddy's was well-lit, and the officers' attention was directed to Keith when Crawford, a male pedestrian, crossed the parking lot and approached Keith's silver Pontiac vehicle, which was waiting in line in the drive-through lane. Defendant's Exhibit 1 at 1; Defendant's Exhibit 2 at 2 ("officer [Ripberger] observed listed suspect in line at the drive-up window"). The officers observed the pedestrian lean into the vehicle's passenger side, look back at the officers, and lean back into the car. Instead of directly exiting the lot, Keith's car then pulled around the building to the building's south side and out of the officers' view. Once Keith's car had pulled away, Crawford looked at the officers a second time, and then followed the car to the far side of the building, out of the officers' view. The most direct route to exit the parking lot from the drive-through would not have required the car to pull around behind the building. A "few seconds" later, Keith pulled out onto Fourth, headed West, made a left turn onto Central, and turned left onto Fifth Street, where he was stopped. Officer Ripberger, who had adequate time to enter his cruiser and turn his vehicle around while Keith and the man on foot were behind the building, promptly pulled over Keith's vehicle. Upon seeing marijuana residue on Keith's pants, Officer Ripberger arrested him, and found a gun, marijuana and cocaine in his possession.

The majority places little weight on the fact that Crawford, the pedestrian, glanced directly at the police cruisers and leaned down to speak with Keith before both individuals proceeded to a location that was out of the officers' sight. The majority states that "it is entirely to be suspected that, out of curiosity, Crawford's attention was drawn to the nearby

police cars with flashing lights at that time of night." While this may be true, the Supreme Court has instructed that we must consider the "totality of the circumstances . . . to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Further, in considering all the circumstances, "the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot." *United States v. Jacob*, 377 F.3d 573, 577 (6th Cir. 2004)(citing *Arvizu*, 534 U.S. at 274-75, 277). Looking at the totality of the circumstances, we must consider Crawford's glance along with the fact that upon spotting the officers and for no apparent reason, he and Keith's car immediately moved to a side of the building that was out of the officers' view. While the fact that Crawford twice looked in the officers' direction would not be sufficient in itself to satisfy a finding of reasonable suspicion, it was certainly a fact, that, along with the surrounding circumstances, contributed to the magistrate judge's finding that Officer Ripberger's suspicion was reasonable.

Additionally, the majority leaves out the important fact that, once Keith's car had pulled away from Crawford, Crawford *again* looked at the officers immediately prior to walking to the south side of Big Daddy's. Officer Ripberger testified that "before [Crawford] left our view he looked back at us to see what we were doing, and then he walked back to the south part of the building where we couldn't see him no more." Officer Stephens stated that Crawford "looked at us before he walked to the rear" and "looked to see where we were and then again went behind the building as well."

The majority found it relevant to characterize the location to which Crawford as well as Keith's car traveled next as being the "side" of Big Daddy's. In recounting the facts, however, the majority notes that "Keith was only 'behind' Big Daddy's from the perspective of the officers." Our task here, however, is to determine whether the *officer* had reasonable suspicion, not whether Keith or any other individual felt that his behavior was suspicious. *See Cortez*, 449 U.S. at 417-18. When asked "And did the car actually go behind the building?" Officer Stephens testified "Yes, sir, it did." Indeed, from the officers' perspective, whether Keith was technically on the side or backside of the building, his behavior suggested an intent to obscure himself from the officers' view. The fact that, immediately upon noticing the officers' presence, both Crawford and Keith proceeded to a

location which was hidden from the officers' view instead of exiting the parking lot in the most convenient manner, was a fact that the magistrate judge was entitled to consider in determining whether the officers had reasonable suspicion.

The majority asserts that "it was possible that Keith was indecisive about which exit from the parking lot to use." That possibility, however, does not explain why Crawford would have followed Keith's car to the far side of the building. Officer Ripberger was specifically asked, "Is there anything in the parking lot of Big Daddy's that would cause an individual on foot to go back there?" Officer Ripberger responded, "No, sir." In *United States v. Paulette*, we considered the defendant's "efforts to evade the police upon noticing them" in holding that reasonable suspicion existed. 457 F.3d 601, 606 (6th Cir. 2006). In *Paulette*, "when [defendant] noticed the officers approaching in their marked squad car, he quickly moved his hand to his pocket and began to walk away from the officers." *Id.* at 602. The majority accurately notes that, in *Paulette*, the officers "actually 'observed [the defendant] and another individual engage in a hand-to hand transaction.'" In analyzing whether reasonable suspicion existed, however, the *Paulette* court explicitly listed both "hand movements consistent with drug-dealing activity" and "efforts to evade the police upon noticing them" as factors that the police were justified in considering. *Id*. at 606. The fact that one of those listed factors was absent in the present case does not prevent us from considering Keith's efforts to evade the officers as one factor among the numerous facts which led to the officers' reasonable suspicion.

While each reasonable suspicion case is factually unique, I do not find the majority's attempt to distinguish the evasive behavior in *United States v. Green* from the behavior of the individuals in this case persuasive. *See* 157 F. App'x 853 (6th Cir. 2005)(unpublished). The facts in *Green* are described as follows:

> [A]t about 2:45 a.m., Officer Matthew Sharp . . . saw a woman leaning close to the passenger side of a car that had stopped in an area known for drug trafficking and prostitution. As Officer Sharp approached the vehicle in his marked police cruiser, the woman left abruptly and the vehicle began to creep forward. Then it quickly pulled off the road and on to the sidewalk. Officer Sharp concluded, based on his experience and knowledge of the area, that the woman may have been soliciting prostitution.

The majority distinguished this case by asserting that in *Green*, the officers directly observed criminal conduct (soliciting prosecution), while in this case, the officers "did not witness any act that arguably appeared to be illegal." The record reveals that from the perspective of the officers, the conduct of Keith and Crawford certainly "arguably appeared to be illegal." When asked what he thought was "going on" when he observed Crawford walk behind the building, Officer Ripberger testified "I believed it to either be a drug deal or possibly somebody that just bought alcohol for an underage person." Further, Officer Stephens testified that the behavior of Keith and Crawford was "typical of a drug transaction in this area." In discussing *Green*, the majority states that "Crawford and Keith could very well have been neighborhood acquaintances rather than drug traffickers, and Crawford might well have leaned into Keith's car window to greet him or to ask if he knew why police cars with flashing lights were gathered on the corner." While this proffered factual scenario may have turned out to be true, the majority fails to conduct the proper inquiry. We have stated that "the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot." *Jacob*, 377 F.3d at 577 (citing *Arvizu*, 534 U.S. at 274-75, 277). Keith's evasive behavior was a factor which Officer Ripberger was entitled to evaluate based on his experience and take into account in forming a reasonable suspicion.

While the majority tries to highlight the fact that Keith and Crawford did not spend adequate time behind Big Daddy's such that Officer Ripberger could have reasonably suspected that a drug transaction was occurring, record evidence suggests otherwise. Officer Ripberger testified that the individuals were behind the building for "fifty seconds maybe, almost a minute." He testified that the period of time that elapsed was "[e]nough for me to be standing on the corner, get in my cruiser, turn around, and as we turned around facing north on Central Street [Crawford] was coming out." Additionally, Officer Stephens testified that, based on his experience in dealing with drug transactions, the time that Keith and Crawford spent on the south side of Big Daddy's was sufficient time for a drug transaction to occur.

Finally, we note that although the fact that an area is known for criminal activity will not in itself justify a *Terry* stop, we will consider it as a factor in determining whether an officer had reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)(noting

that an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," but stressing that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.").

The majority states that apart from Crawford's glances in their direction and the subsequent move to an obscure location by both Keith and Crawford, the officers had no "additional facts to support their claim of reasonable suspicion, other than the late hour and the 'bad' neighborhood in which they were located." I disagree. Based on the totality of the circumstances, Officer Ripberger had more than enough facts to support a reasonable suspicion that Keith was engaged in criminal activity. At the suppression hearing, Officer Ripberger described the facts that contributed to his reasonable suspicion:

> [I]t's late at night, it's a known drug area, you have a subject looking at us inside the vehicle, approaches the vehicle and is inside the vehicle talking to somebody, looks back at us, steps back away from the vehicle, starts to walk away...from our sight, pulls around the building without exiting when he could have exited onto Central Street right from the drive-through, drives back around the back of the building out of our view, the person on foot looks back at us to see what we're doing and walks back toward the vehicle. Now by the time we get turned around they come walking out from behind the building, which would have exited onto Central Street from the entrance of Big Daddy's, goes back behind the building, pull out on Fourth Street and then makes a left onto Fifth Street when he could have exited straight out Big Daddy's lot.

Both officers observed a man approach and lean into a car parked in a drive-through lane at 1:45 a.m. in a high drug trafficking area. The observed encounter took place in the parking lot of a shop that was a known seller of drug paraphernalia. When the individual on foot noticeably spotted the officers' cruisers parked across the street, he and the car moved to a location that was out of the officers' sight and that was not in the direction from which a car would ordinarily exit that parking lot onto Central. Before obscuring themselves from the officers' sight, the man on foot again looked at the officers. The officers' conclusion that, based on their experience, this was indicative of a drug transaction was not unreasonable. Police officers, charged with the difficult task of protecting the public, are not required to consider every possible innocent explanation for each suspicious incident they observe, but

instead are permitted to make determinations based on their own experience. Based on the suspicious actions that the officers observed, the experience of the officers in observing drug transactions, the time of night at which the encounter occurred, and the "high drug trafficking area" in which the episode occurred, reasonable suspicion existed that Keith was involved in criminal activity.

For the foregoing reasons, I would find that reasonable suspicion existed and **AFFIRM** the ruling of the district court.