RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0128p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

No. 23-3656

*v.*

DORIAN DEON MCMULLEN,

*Defendant-Appellant.*

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:22-cr-00094-1—Dan A. Polster, District Judge.

Decided and Filed:  June 7, 2024

Before: MOORE, McKEAGUE, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Lori Beth Riga, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant.  Kevin Bringman, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

McKEAGUE, J., delivered the opinion of the court in which GRIFFIN, J., concurred. MOORE, J. (pp. 10–14), delivered a separate dissenting opinion.

_____

## OPINION

_____

McKEAGUE, Circuit Judge.  Police found incriminating evidence in Dorian McMullen's car.  The district court denied McMullen's motion to suppress that evidence.  Seeing no Fourth Amendment violation, we **AFFIRM**.

**I.**

It was shortly after midnight on September 16, 2021. Anthony Lampkin and Kevin Warnock, detectives in Cleveland Police's gang-impact unit, were surveilling a neighborhood known for gang activity and violent crime. They wore tactical police vests and rode in an unmarked Dodge pickup truck. During their shift, the detectives recognized a parked vehicle that belonged to a local gang member. They drove toward the vehicle as it idled on the side of the street.

As the detectives drew closer, a second car caught their attention. It was parked a few meters behind the target vehicle, and its driver-side door was open. Dorian McMullen sat in the driver's seat with his legs sticking out the open door. Lampkin found the sight "very odd for that time of night." Hr'g Tr., R.41 at PageID 290. The detectives saw McMullen look up at their truck and then reach down for something around his car's floorboard. Lampkin suspected that McMullen was reaching for a gun.

The police truck stopped next to McMullen's car. Lampkin, sitting in the truck's passenger seat, rolled down his window. Given the truck's height, Lampkin didn't think that McMullen could see his police vest. He hopped out of the truck so that his vest and attached badge were clearly visible. Without being asked, McMullen exited his own car and closed the door behind him. He and Lampkin stood face to face.

A brief conversation took place. "[Y]ou were reaching pretty hard," Lampkin said. *Id.* at PageID 295. McMullen, who claims he didn't feel free to leave, informed the detectives that he had suffered gunshot wounds a few weeks earlier. Lampkin frisked McMullen for weapons and asked him if he carried a firearm for protection.[1] "[Y]eah, I do," McMullen allegedly replied. "I carry a gun for my protection, it's in the vehicle." *Id.* According to the detectives, McMullen also volunteered that he had crack cocaine in the car.

---

[1]The record isn't clear about precisely when the pat-down occurred. Warnock's police report recounts that it happened before Lampkin asked McMullen if he carried a firearm. But Lampkin testified that he didn't frisk McMullen for weapons until later in the encounter. That discrepancy does not affect the outcome of this case.

During that exchange, Warnock walked around McMullen's car and shined a flashlight into the interior.  He announced that he could see a gun.  The detectives recovered a loaded pistol and some narcotics from the vehicle's passenger compartment; they arrested McMullen on state drug and firearms charges.

Federal authorities charged McMullen with being a felon in possession of a firearm.  McMullen moved to suppress the gun that police had recovered from his vehicle, arguing that it was seized in violation of his Fourth Amendment rights.

The district court denied the motion after holding an evidentiary hearing.  It found that the detectives had reasonable suspicion to temporarily stop and question McMullen.  The court listed several factors to support that finding: the high-crime neighborhood, the close proximity to a gang member's car, and McMullen's reaching motion toward the car's floorboard when he saw the unmarked police truck.  The district court also found—despite McMullen's testimony to the contrary—that McMullen had told the detectives that he had a gun in his car.  The court further decided that, given officer-safety concerns, the detectives lawfully frisked McMullen and searched the passenger compartment of his car for accessible weapons.  Having reached that decision, the court declined to address the government's alternative argument that the detectives spotted the gun in plain view.

McMullen pleaded guilty and then promptly appealed.

**II.**

When reviewing a district court's decision on a motion to suppress, we review its factual findings for clear error and its legal conclusions de novo.  *United States v. Whipple*, 92 F.4th 605, 610 (6th Cir. 2024).  Because the district court denied McMullen's motion to suppress, we must consider the evidence in a light most favorable to the government.  *See id.*

**III.**

McMullen argues that the district court erred in denying his motion to suppress.  First, he contends that the detectives lacked the requisite reasonable suspicion to justify their initial stop.

Next, he argues that the detectives had no constitutional basis for searching his vehicle.  Thus, McMullen concludes, the detectives violated his Fourth Amendment rights.  We disagree.

## A.

The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV.  Generally speaking, government officers must secure a warrant through the judicial process before conducting a search or seizure.  *See Katz v. United States*, 389 U.S. 347, 357 (1967).  That general rule, however, is subject to several well-established exceptions. *Minnesota v. Dickerson*, 508 U.S. 366, 372–73 (1993).

One such exception appears in *Terry v. Ohio*, 392 U.S. 1 (1968).  *Terry* authorizes police officers to conduct temporary investigative stops without a warrant or probable cause.  To justify a *Terry* stop, police must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see Terry*, 392 U.S. at 20–21.  That "reasonable suspicion" standard demands less than probable cause.  *Alabama v. White*, 496 U.S. 325, 330 (1990). But it isn't satisfied by a mere hunch. *Terry*, 392 U.S. at 22.

During *Terry* stops, police officers may take reasonable steps to protect themselves and others from physical harm.  *Id.* at 23–24.  For example, officers can perform protective searches for weapons if they reasonably suspect that the stopped individual is "armed and dangerous."  *Id.* at 26–27.  Sometimes, the protective search is limited to a pat-down of the suspect's outer clothing.  *See id.* at 27, 29–30.  But in *Michigan v. Long*, the Supreme Court recognized that more expansive protective searches can be appropriate in the "especially hazardous" context of *Terry* stops involving automobiles.  463 U.S. 1032, 1049 (1983).  Officers with the requisite reasonable suspicion may search the passenger compartment of a suspect's vehicle—including closed compartments—for accessible weapons.  *Id.* at 1048–50.  That's true even if the suspect isn't inside the vehicle at the time.  *Id.* at 1051–52.

In short, our touchstone for reviewing a *Terry* stop—both the stop's inception and any protective searches—boils down to "reasonableness."  *Pennsylvania v. Mimms*, 434 U.S. 106,

108–09 (1977). *Terry* and its progeny seek a sensible balance between legitimate government interests and individuals' rights to personal security. *Long*, 463 U.S. at 1046–47, 1051. In striking that balance, courts consider the totality of circumstances in each case. *See id.* We also afford due weight to reasonable inferences that officers may draw from a given situation in light of their training and experience. *See Terry*, 392 U.S. at 20–21, 27.

**B.**

Turning to this case's facts, the detectives conducted a valid *Terry* stop. Both the initial stop and the protective search pass constitutional muster.

**1.**

We start with the stop's inception. Did the detectives have a valid basis for initiating a *Terry* stop? Considering the totality of the circumstances, our answer is "yes."

In tackling this reasonable-suspicion inquiry, we focus on what the detectives knew when they exited their truck and started questioning McMullen.[2] They identify several factors supporting their suspicion that McMullen was unlawfully carrying a concealed weapon: (1) he was in a high-crime neighborhood known for gang activity and gun violence; (2) it was late at night; (3) his car was parked close behind an idling vehicle owned by a known gang member; (4) he was seated in a peculiar manner; and (5) he made a reaching motion toward his car's floorboard when he saw the detectives approaching in their unmarked pickup truck—a motion that, in Detective Lampkin's experience, resembled someone reaching for a gun.

Taken together, these factors create reasonable suspicion. We deemed a *Terry* stop valid under somewhat analogous circumstances in *United States v. Clay*, 181 F. App'x 542 (6th Cir. 2006). There, a police officer patrolling a high-crime neighborhood spotted a vehicle parked

---

[2]The record makes it difficult to pinpoint precisely when the encounter became a *Terry* stop. *Terry* isn't implicated until officers "seize" a suspect by restricting his freedom of movement through physical force or a show of authority. *See Terry*, 392 U.S. at 16; *Brendlin v. California*, 551 U.S. 249, 254 (2007). McMullen testified that the detectives blocked his path with their truck and immediately ordered him not to move. But the detectives deny those allegations, and the district court never expressly made a finding either way. That said, the district court did conclude that the stop was a seizure for *Terry* purposes. We will assume for purposes of this appeal that *Terry* was implicated at the very beginning of the encounter.

near an abandoned house. The vehicle's occupants watched the officer as he passed. They then made rapid hand movements when the officer doubled back. *Id.* at 543–44. Those factors justified the officer's decision to detain the suspects. *Id.* So too here. *See also United States v. Pearce*, 531 F.3d 374, 382–83 (6th Cir. 2008) (finding reasonable suspicion where, among other things, the defendant's hand movement made a police officer suspect—based on training and experience—that the defendant was reaching for a weapon and preparing to fire); *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (explaining that the time of night and a neighborhood's high-crime reputation can support a reasonable-suspicion finding when paired with other factors), *abrogated on other grounds by Mathis v. United States*, 579 U.S. 500 (2016).

McMullen pushes back. The thrust of his argument targets the fifth factor: his reaching motion toward the floor of his vehicle. In McMullen's view, that behavior isn't probative in this case; he suggests that such movements are suspicious only if the subject knows he is in the presence of law enforcement. Here, the detectives—who rode in an unmarked pickup truck—said that they didn't think McMullen had yet recognized them as police when they observed his reaching movement. From McMullen's reading, that sets his case apart from *Clay*. After all, those suspects seemingly knew that a police car was approaching when they made their suspicious hand movements. *See Clay*, 181 F. App'x at 543.

We find McMullen's argument unpersuasive. True, some behaviors—like trying to conceal an object from view—are particularly suspicious when prompted by a police officer's unexpected appearance. *See, e.g.*, *Caruthers*, 458 F.3d at 466 (noting that "furtive movements made in response to a police presence" contribute to an officer's reasonable suspicion). But that doesn't justify the categorical rule McMullen seeks. Indeed, he concedes that some hand movements are inherently suspicious, regardless of the subject's awareness of nearby law enforcement. *See, e.g.*, *United States v. Jones*, 673 F.3d 497, 500, 502–03 (6th Cir. 2012) (apparent "hand-to-hand transaction" in high-crime neighborhood). The detectives observed McMullen reach for something—potentially a gun—in response to their approaching truck.

Such behavior, viewed together with the surrounding circumstances, could indicate criminal activity even if McMullen hadn't realized that the truck contained police officers.[3]

Relatedly, McMullen notes that several innocent explanations could account for his reaching movement. That's undoubtedly true. But the same thing could be said for just about any suspicious behavior. Importantly, the detectives relied on their training and experience to infer that McMullen was grasping for a weapon. *See Pearce*, 531 F.3d at 382–83; *see also Terry*, 392 U.S. at 20–21, 27. And that inference's reasonableness cannot be separated from contextual circumstances surrounding the stop: it was after midnight in a neighborhood known for gun violence, McMullen was parked directly behind a known gang member's idling car, and his seated positioning was "odd for that time of night." It may be correct that, standing alone, none of those individual considerations can support reasonable suspicion. Together, though, they are enough.

**2.**

Next, we examine the detectives' conduct during the *Terry* stop—particularly their vehicle search. We agree with the district court that the detectives took reasonable protective measures to ensure their physical safety. Their search didn't offend McMullen's constitutional rights.

To justify a protective search for weapons during a *Terry* stop, officers must have reasonable suspicion that the stopped person is armed and dangerous. *Terry*, 392 U.S. at 26–27; *see also Long*, 463 U.S. at 1047–48. The detectives satisfy that requirement here. Given the factors described above, they reasonably suspected that McMullen had access to a concealed firearm that posed a risk to their safety. The detectives were therefore allowed to pat down McMullen's outer clothing. *See Terry*, 392 U.S. at 27, 29–30. And, more importantly for

---

[3]Seeing things differently, the dissent focuses on so-called "furtive movements"—a type of suspicious behavior. *See* Dissenting Op. at 2. We don't dispute that "quiet and secretive" movements made "to avoid being noticed" might have special relevance when performed in reaction to authority. *See id.* (quoting a dictionary's definition of "furtive"). But not all suspicious movements are furtive. Indeed, reaching for a potential weapon as an unknown vehicle approaches isn't necessarily a "furtive" behavior—and, just like apparent hand-to-hand transactions, it isn't linked with efforts to avoid detection. That naturally makes the subject's apparent unawareness of police presence less significant.

McMullen's motion to suppress, they were also permitted to search the passenger compartment of his vehicle—limited to areas that could store a weapon—for any immediately accessible firearms. *See Long*, 463 U.S. at 1049–51. That's especially true given McMullen's admission to the detectives that he kept a gun in there.

McMullen disagrees. He argues that *Long* doesn't apply because, in his view, the gun inside his vehicle wasn't immediately accessible to him at the time of the search. For support, he cites unrebutted testimony that he had shut the car door behind him when he exited his vehicle to greet the detectives.

But McMullen interprets *Long* too narrowly. *Long* clarified that protective vehicle searches can be appropriate even when the suspect is outside of his vehicle and under police control. *Id.* at 1051–52. The Court reasoned that such a suspect might "break away from police control and retrieve a weapon from his automobile." *Id.* It also acknowledged that if a *Terry* stop concludes without an arrest, officers must allow the suspect "to reenter his automobile, and he will then have access to any weapons inside." *Id.* By that logic, a weapon isn't necessarily inaccessible just because it is temporarily behind a closed door. *See id.* at 1049 (authorizing searches of any "closed container found within the passenger compartment").

Here, the district court reasonably found that the contents of McMullen's car were sufficiently accessible and that the *Long* search was justified under the circumstances. After all, McMullen stood immediately next to his vehicle. The detectives, who occupied a "particularly vulnerable" position, understandably wanted to prevent McMullen from grabbing a lethal weapon. *See id.* at 1052. Indeed, we've previously authorized protective searches of far less accessible vehicles. *E.g.*, *United States v. Shank*, 543 F.3d 309, 312, 315 (6th Cir. 2008) (permitting *Long* search of closed glovebox while suspect was detained in the back of a police cruiser); *United States v. Boyett*, 295 F. App'x 781, 783, 785 (6th Cir. 2008) (allowing *Long* search of closed center console while handcuffed suspects were detained in separate police cruisers); *accord United States v. Christian*, 187 F.3d 663, 670 (D.C. Cir. 1999) (holding *Long* search permissible even though the suspect's car doors were closed and locked). The detectives did not violate McMullen's Fourth Amendment rights when they searched his car.

**IV.**

The district court properly denied McMullen's motion to suppress. We **AFFIRM** its judgment.

_____

**DISSENT**

_____

KAREN NELSON MOORE, Circuit Judge, dissenting.    The characteristics of a neighborhood do not provide police officers with free rein to stop anyone exhibiting the slightest bit of suspicious behavior.  Police stopped Dorian McMullen, however, based on a hunch that he was engaged in criminal activity because of the neighborhood he was in and due to a largely innocent movement.  This combination of facts known to the officers prior to the stop did not provide them with reasonable suspicion to stop McMullen.  Because officers should not have stopped McMullen, I would reverse the district court's denial of McMullen's motion to suppress.  Accordingly, I respectfully dissent.

The facts are not in dispute on appeal.  Prior to stopping McMullen, all that police officers knew was that (1) McMullen was legally parked on the side of the street with his car door open; (2) a gang member with no known affiliation to McMullen was parked on the street; (3) it was a "high crime" neighborhood; (4) it was night; and (5) McMullen, without the police officers believing that he recognized them as law-enforcement officers, reached down inside his car upon seeing the unmarked patrol vehicle.  Three of these facts have nothing to do with McMullen—that is, they are not particularized and thus are entitled to little weight in the reasonable-suspicion calculus.  Time and time again, this court has stressed that whether an area is "high crime" and the time of day may be *considered* when assessing reasonable suspicion but add little to establishing it.  *See, e.g.*, *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009) (explaining that "context-based factors" including whether a neighborhood is prone to crime and the time of day "that would have pertained to anyone in the parking lot at that time . . . should not be given undue weight"); *United States v. Johnson*, 620 F.3d 685, 692–93 (6th Cir. 2010) (same).    And it is hardly necessary to explain that reliance on the characteristics of a neighborhood to establish reasonable suspicion comes with its own serious concerns.  *See United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) ("[L]abeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling.").  That McMullen was allegedly parked near a gang member's car adds little to the mix, too, lest we impute one person's

suspicious activities to someone else. *See United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003) ("Because the officers might have seen one member of the group throw something lends little more to the totality of the circumstances surrounding [a different person].").

The facts specific to McMullen fail to create reasonable suspicion, too. For one, the officers agree that McMullen was engaged in perfectly legal behavior when he was parked on the side of the street with his car door open. Accordingly, the balance of the suspicion must have come from McMullen's reaching down when he saw the unmarked truck approach his parked vehicle. But officers affirmatively believed that McMullen *did not recognize them* as officers, so the notion that a "furtive movement" in reaction to police presence can contribute to reasonable suspicion should not come into play here. *See, e.g.*, *Johnson*, 620 F.3d at 695 ("[T]here is an ongoing debate about the circumstances under which *a person responding to the arrival of police* will raise suspicion of wrongdoing." (emphasis added)) (collecting cases); *Caruthers*, 458 F.3d at 466 ("Furtive movements *made in response to a police presence* may also properly contribute to an officer's suspicions." (emphasis added)). Put differently, it makes no sense to call a movement "furtive" when it is not done in reaction to authority. *See Furtive*, Merriam-Webster.com, https://perma.cc/TDG4-UKA8 (last accessed May 30, 2024) ("done in a quiet and secretive way to avoid being noticed"). Regardless, McMullen's reaching down into his car is hardly akin to a hand-to-hand transaction "consistent with a drug transaction" as in *United States v. Jones*, 674 F.3d 497, 502 (6th Cir. 2012). *See* Maj. Op. at 6. Although there may be innocent explanations for any behavior, surely an action that directly resembles criminal behavior taking place on the street is of a different kind than merely reaching down for what could be a wallet, or a license and registration, or a dropped phone. Indeed, we have previously explained that "courts must take care that [an individual's furtiveness] not be invoked cavalierly" when assessing reasonable suspicion. *Caruthers*, 458 F.3d at 466; *see also United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) ("Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.").

Our caselaw demonstrates that these facts, even considered together, fail to clear the reasonable-suspicion bar. In *Patterson*, we held that a suspect's congregating with a large group

of men outside a house near a street corner about which police received a complaint reporting drug dealing did not create reasonable suspicion, even when the suspect and others put their hands in their pockets and began walking away from police officers once officers arrived. 340 F.3d at 369, 371–72. As with reaching down inside of a car, a person's putting their hands in their pockets and walking away from the police "constitutes a factor to be outrightly dismissed" as "innocent and insufficient to provide the police with reasonable suspicion." *Id.* at 372. Similarly, in *Johnson*, the defendant's innocent behavior of ignoring a police demand to stop moving while simultaneously carrying a bag which he "threw into" a car did not provide police with reasonable suspicion, despite the conduct taking place in a "high drug-trafficking area" during the early morning hours and after the police arrived in response to a 911 call. 620 F.3d at 692–95. Like reaching down into a car, "there was nothing suspicious about [the defendant's] walk toward the white car, least of all the fact that he carried a bag," which were the only facts specific to the defendant. *Id.* at 695. Finally, in *United States v. Keith*, police officers lacked reasonable suspicion to stop the defendant based on his activity outside of a liquor store. 559 F.3d 499, 505–07 (6th Cir. 2009). Officers observed a pedestrian walk up to the defendant's car while the defendant stopped at a drive-through window at the store, interact with the defendant, and the pedestrian twice look over towards the police officers. *Id.* at 505. Despite this, the defendant's and pedestrian's moving to the other side of the liquor store away from the police in reaction to their presence did not create reasonable suspicion because, like reaching down to a floorboard, the actions were too "ambiguous." *Id.* at 505–06. In all of these cases, the allegedly suspicious activities occurred at night, in "high crime" areas, and appeared to be in reaction to police presence. But as here, those facts combined with largely innocent behavior did not add up to reasonable suspicion. These cases control and demonstrate that officers did not have reasonable suspicion to stop McMullen based on his reaching down to the floor of his car.

Perhaps recognizing these issues, the majority opinion attempts to recast our precedent and imbue McMullen's action with some additional level of suspicion. The majority opinion places great weight on *United States v. Clay*, an unpublished decision, despite the clear factual differences between what police officers knew in that case and what they knew here. 181 F. App'x 542 (6th Cir. 2006). In *Clay*, the patrolling officer observed two vehicle passengers "intently watch[] him pass" and then saw the passengers "make furtive motions with their hands

in the direction of the dashboard" as he passed a second time. *Id.* at 543. The court held that the occupants' clear reactions to two instances of police presence created reasonable suspicion for a stop in combination with other contextual factors. *Id.* at 544. Of course, the officers here did not believe that McMullen recognized them as police officers; did not circle back around as in *Clay* and observe McMullen twice react to their presence; and did not suggest that McMullen's reaching down was overly nervous or "rapid," as in *Clay*. Ignoring these salient differences, the majority opinion then turns to *United States v. Pearce*, 531 F.3d 374 (6th Cir. 2008), and *United States v. Caruthers*, 458 F.3d 459 (6th Cir. 2006), to attempt to bolster its conclusion. Maj. Op. at 6. But the majority opinion explicitly recognizes that these cases are inapposite with its flagrant reference to the "other things" and "other factors" that created reasonable suspicion in both cases. *Id.* Those "other things" supporting reasonable suspicion in *Pearce* included the suspect directly seeing the officer, the suspect "hunch[ing] over a bit," and sticking "his right hand into . . . the small of his back at his waistline, and then . . . backing up away from" the officer. 531 F.3d at 377–78. The "other factors" in *Caruthers* included an anonymous shot-fired call, the suspect's "general appearance and location" matching the description in the call, the suspect "'hurr[ying]'away in a 'semi-running' manner" in direct reaction to witnessing an officer, and the suspect "'hunch[ing] down' near a wall" once the office gave chase, suggesting that the suspect was discarding a weapon or contraband. 458 F.3d at 465–67. To describe these cases is to show they have no bearing here. *See also Jones*, 673 F.3d at 502–03 (reasonable suspicion based on conduct taking place in area known for drug activity, observation of suspect "engaged in an apparent hand-to-hand transaction," suspect running away when officer exited his vehicle, and suspect throwing items to the ground while fleeing).

Once the majority opinion's analysis is exposed to any scrutiny, it falls apart. At bottom, it turns on the tautology that officers had reasonable suspicion because McMullen's single innocent movement was somehow inherently suspicious. No doubt, reasonable suspicion is a lower bar than probable cause. But it still requires "specific and articulable facts" that would lead a reasonable officer to believe a crime may be occurring, as opposed to "inarticulate hunches," in recognition of the "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment." *Terry v. Ohio*, 392 U.S. 1, 17, 21–22 (1968). Here, officers intruded upon McMullen's person and subjected him to a great indignity

based on nothing more than a hunch. Because officers should not have stopped McMullen, I would reverse the district court's denial of his motion to suppress and respectfully dissent.